Vivek Kothari (Cal. Bar No. 262842)
vivek@kothari.law
KOTHARI LAW
555 SE Martin Luther King Blvd., Suite 3022
Portland, OR 97214
Telephone: (503) 567-6735

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| JESSICA LUU and KELLY ESCOBEDO, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>ASHLEY GLOBAL RETAIL, LLC d/b/a ashleyfurniture.com,<br><br>*Defendant*. | Case No. 5:26-cv-2806<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>1. Invasion of Privacy<br>2. Intrusion upon Seclusion<br>3. Wiretapping in Violation of California Invasion of Privacy Act<br>4. Use of a Pen Register in Violation of California Invasion of Privacy Act<br>5. Common Law Fraud, Deceit, and/or Misrepresentation<br>6. Unjust Enrichment |

Class Action Complaint

**Table of Contents**

I.      Introduction. .................................................................................................... 1

II.     Parties. ............................................................................................................ 3

III.    Jurisdiction and Venue. ................................................................................... 3

IV.     Facts. ............................................................................................................... 4

        A.      Websites and Cookies. ......................................................................... 4

        B.      Defendant and its Website. ................................................................... 8

        C.      Defendant falsely told users that they could reject the Website's use of cookies........ 10

        D.      Defendant's conduct violated its own policy. ...................................... 19

        E.      The Website collected Private Communications by using Third Party cookies. ......... 19

                1.      Google and Doubleclick Cookies ............................................ 23

                2.      Cquotient cookies..................................................................... 31

                3.      Pinterest cookies....................................................................... 39

        F.      The Private Communications are valuable. ......................................... 45

        G.      Plaintiff Jessica Luu. ......................................................................... 47

        H.      Plaintiff Kelly Escobedo. ................................................................... 51

V.      Class action allegations. ................................................................................ 54

VI.     Claims. .......................................................................................................... 56

        First Cause of Action:  Invasion of Privacy .................................................... 56

        Second Cause of Action:  Intrusion upon Seclusion......................................... 58

        Third Cause of Action:  Wiretapping in Violation of the California Invasion of Privacy

                Act  (California Penal Code § 631)............................................................. 60

        Fourth Cause of Action:  Use of a Pen Register in Violation of the California Invasion

                of Privacy Act  (California Penal Code § 638.51) ...................................... 64

        Fifth Cause of Action:  Common Law Fraud, Deceit, and/or Misrepresentation ................... 65

        Sixth Cause of Action:  Unjust Enrichment....................................................... 66

VII.    Relief............................................................................................................. 67

VIII.   Demand for Jury Trial.................................................................................... 67

i

Class Action Complaint

## I.    Introduction.

1.    Defendant operates a retail website at ashleyfurniture.com (the "Website") which sells furniture and other home furnishings to consumers. The Website functions as an e-commerce storefront and marketing platform, showcasing products, promotions, financing options, and links to online ordering and physical Ashley locations.

2.    The Website incorporates resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. These cookies and tracking technologies transmit data to third parties.

3.    When users visit the Website, it informs them that it uses "cookies and session replay tools to . . . optimize the performance of our website, enhance site navigation, analyze site usage, and assist in our marketing efforts." It also allows users the option to "Configure" the cookies and tracking technologies that it uses as shown in this screenshot:

4.    Clicking the "Configure" button presents a screen (shown below) where users can choose to "Reject All" cookies and tracking technologies, thereby enabling users to browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers.

1

Class Action Complaint



5.      Those representations are false. Even after a user chooses to "Reject All" cookies, Defendant still caused multiple third parties—including Google LLC (through DoubleClick and Google Analytics), Pinterest, Cquotient, Bing, and others (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

6.      Users who select "Reject All" reasonably expect that the Website will not place or cause to be placed any cookies, particularly those used to optimize performance of the Website, enhance site navigation, analyze site usage, and assist in Defendant's marketing efforts. The same goes for users who reject only some and not all cookies. Those users expect that the Website will not place or cause to be placed any cookies that they have rejected. But even for those users who have rejected cookies (whether some or all), the Website continues to enable the Third Parties to place or transmit advertising, analytics, and/or tracking cookies. These cookies and their associated network requests capture private communications and interactions between users and Defendant.

2

Class Action Complaint

7. Website users sought to avoid this type of tracking and data sharing when they rejected cookies. Defendant falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Website.

8. The Third Parties use the data they collect from users to analyze and track behavior across different websites and over time. They use this information to build and monetize detailed consumer profiles that include users' interests, preferences, and demographic characteristics. These profiles are used to group individuals into audience segments—such as "eco-friendly / EV" or "auto enthusiasts"—for targeted advertising and marketing analysis.

9. Data provided by users of websites is very valuable to advertisers because it enables precise targeting, behavioral profiling, and real-time optimization of ad campaigns, all of which increase conversion rates and sales.

10. Defendant offered users the choice to reject cookies and other tracking technologies and then ignored those choices and tracked them (or allowed them to be tracked) anyways. By doing so, Defendant ignored its users' express declination of consent and violated state statutes, tort laws, and its contractual duties.

11. Plaintiffs are two such Website users who expressly told Defendant that they rejected all cookies and tracking technologies. They bring this case for themselves and other users who similarly rejected all cookies but whose choices the Defendant and its Website ignored.

## II. Parties.

12. Plaintiff Jessica Luu is domiciled in Roseville, California.

13. Plaintiff Kelly Escobedo is domiciled in Tustin, California.

14. The proposed class includes citizens of California.

15. Defendant Ashley Global Retail, LLC is a Delaware limited liability company headquartered in Florida. It is registered to do business in California and does business throughout California and the entire United States, including approximately 10 locations within this district, including one in San Jose. Its sole member is Ashley Holdings, Inc., a Delaware corporation that is also headquartered in Florida.

## III. Jurisdiction and Venue.

Class Action Complaint

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiffs and the Defendant, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17.     The Court has personal jurisdiction over Defendant because Defendant is registered to do business in California and does business throughout California including in this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District, the Defendant resides in this District, and the Defendant is subject to the Court's personal jurisdiction with respect to this action.

## IV.     Facts.

### A.     Websites and Cookies.

19.     Every time someone visits a website, their browser communicates with the website's server using HTTP requests—typically "GET" or "POST" requests. For example, when a user clicks a link, their browser sends a GET request to the website's server asking for a specific page. The server then responds with the content of that page. These requests include the user's Internet Protocol (IP) address which allows the Website server to identify the origin of the request and return the response.

20.     An IP address is a unique numerical label assigned to each device connected to the internet. It serves two principal functions: identifying the host or network interface and providing the location of the device within the network. IP addresses are typically expressed in IPv4 format as four sets of numbers separated by periods (e.g., 192.168.0.1). When a user connects to a website, their browser includes the device's IP address in each request so the server knows where to send the response. Because IP addresses can often be linked to a geographic location or Internet Service Provider, they can be used to identify a user's city, region, or location.

21.     As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

22.     Defendant and its Website integrate third-party resources into its website code— software components or content delivered by outside entities such as advertising networks, analytics

4

Class Action Complaint

providers, and social media platforms. These third-party resources are embedded through programming scripts, image tags, pixels, or iframes, and are typically loaded directly from external servers not operated by the Website. These third-party resources include tracking and advertising scripts, analytics libraries, tracking pixels, and social media plug-ins. When a user visits the Website, these embedded elements cause the user's browser to automatically send requests to the third-party domains, which in turn may place tracking cookies on the user's device, load tracking pixels, or execute scripts that monitor user behavior. The use of such third-party technologies is governed by separate agreements between Defendant and the third-party vendor, and enables the vendor to collect data for behavioral advertising, analytics, and user profiling purposes.

23. When users visit the Website, their browsers are instructed to send and receive cookies—small text files that store data associated with the user's device and browsing session. Each time a user navigates to a new page within the Website or returns to the Website in a new session, the browser makes network requests to the Website's servers, and third-party servers, to load the page and its associated resources (HTML, CSS, JavaScript, images, trackers, etc.). These cookies are automatically included with the network requests to the Website and its third-party partners, allowing them to identify the user and remember prior activity.

24. Cookies generally contain a unique identifier that enables persistent tracking over time. By reading this identifier, the receiving server can distinguish one user from another and maintain a continuous session profile, even across multiple visits. In addition to identifiers, cookies can store other data, such as user preferences, login tokens, language settings, and tracking parameters that link behavior across different sites and platforms. When embedded third-party resources (such as ad scripts or analytics tags) load on the Website, they can cause the user's browser to transmit or receive third-party cookies—cookies set by a domain other than the Website itself. These third-party cookies can be used to create behavioral profiles, monitor advertising effectiveness, and retarget users with personalized ads based on their browsing history.

25. First-party cookies are those set directly by the Website's own domain. When a user interacts with the Website—for example, by browsing listings, running searches, or navigating between internal pages—the Website may store identifying information in cookies created under its

5

Class Action Complaint

own domain name (e.g., ashleyfurniture.com). These cookies are used to maintain user session data, remember preferences, and record repeat visits. Because the cookies are tied to the Website's domain, they are automatically sent back to the Website with each HTTP request the user makes while navigating within the site.

26. Third-party cookies are set by domains other than the Website's own (for example, Pinterest or Google). When the Website loads embedded resources—such as advertising scripts, analytics tools, or social media widgets—those third-party elements can instruct the user's browser to send or receive cookies associated with the third party's domain (e.g., doubleclick.net, pinterest.com). The browser includes these cookies when sending requests to those external domains, allowing the third party to recognize returning users across different websites. Third-party cookies typically contain a persistent identifier, enabling the third party to track the same user across multiple browsing sessions and unrelated websites. This cross-site tracking allows the third party to build a profile of the user's online behavior, preferences, and demographics.

27. Cookies are often linked to network requests—data (including the cookie) sent from the user's browser to a third party server—which allows third parties to track user behavior across websites and over time.

28. Third-party cookies enable third parties to track in real time and collect Website users' personal information such as browsing activities and Private Communications with Defendant, including the following (collectively, the "Private Communications"):

- **Browsing history**: Records of the pages a user visits on the website, the order in which those pages are accessed, how the user navigates between them, and whether the user is returning or visiting for the first time. This data allows the tracker to reconstruct a full map of the user's interaction with the site.
- **Visit history**: Information about how often and when a user returns to the Website—including visit counts, dates, times, and span between visits—enabling the creation of a usage timeline that shows frequency and patterns over time.

6

Class Action Complaint

- **Website interactions**: Clicks, form actions, scrolls, and other interactive components. This data reveals what users are interested in or intending to do and is used for conversion tracking, user intent modeling, and interface optimization.

- **User input data**: Websites often include interactive features—such as search bars, dropdown filters, zip code locators, or form fields—that allow users to enter information manually.

- **Demographic information**: Inferred over time from user behavior, device characteristics, and external datasets. Users are placed into audience segments based on likely age, gender, income, lifestyle, or shopping intent (e.g., "truck shoppers" or "first-time car buyers").

- **Interests and preferences**: Information about a user's preferred content categories or topics—like bedroom sets, dining tables, or financing options—is captured from repeated visits to relevant pages or engagement with specific types of listings. This data supports interest-based advertising and recommendation engines.

- **Shopping behavior**: In addition to explicit inputs, trackers collect data about how users interact with the site's content and listings. This includes products or listings the user viewed, items the user saved, favorited, or added to comparison lists, pages the user revisited or browsed multiple times, time spent on specific listings, and navigation paths that indicate decision-making. This behavioral data allows third parties to model a user's stage in the purchasing funnel, infer their preferences and price sensitivity, and tailor future ad delivery accordingly—including across unrelated websites and apps.

- **Device information**: Details about the type of device (mobile, desktop, tablet), OS (e.g., iOS, Android), and browser/version (e.g., Chrome 124).

- **Referring URL**: The referrer reveals the previous webpage visited before landing on the current page. This may include internal navigation data or external sources (e.g., search engines) and query parameters disclosing user search behavior.

7

- **Session information**: Session start/end timestamps and duration data. A key metric for profiling user engagement and determining how long a user is exposed to specific content or ads.
- **User identifiers**: Persistent cookie or ID values used to link activity across sessions/sites.
- **Geolocation data**: Location information based on the Website user's IP address or GPS data, if accessible.
- **IP address**: The user's IP address is sent with most HTTP requests and can be used to infer location (city or ZIP code), identify internet service provider, and detect network type (e.g., mobile, corporate, residential).

29. Third-party cookies are used for a variety of purposes, including analytics (tracking and analyzing user behavior, user engagement, and effectiveness of marketing), personalization (remembering a user's browsing history and purchasing preferences to enable product recommendations), advertising/targeting (delivering targeted advertisements based on a user's profile), and social media integration. They also enable retargeting—showing users ads for products they previously viewed—as well as audience segmentation, attribution analysis, and synchronization of user identifiers across multiple adtech platforms. This allows third parties to construct detailed, persistent profiles of individual users based on their online behavior, preferences, and demographic characteristics. The resulting profiles are used to deliver interest-based advertising, conduct real-time bidding, and build audience segments for resale or further monetization.

**B.    Defendant and its Website.**

30. Defendant sells and markets home furnishings through the Website and users communicate with Defendant when they browse the Website and interact with it.

31. Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. When consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a

8

Class Action Complaint

user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

32. Defendant's Privacy Notice explains that it uses "tracking technologies in your browser and mobile apps . . . include[ing] cookies, web beacons, tags and scripts, software development kits (or SDKs) . . . to track and store data about how you visit and use our sites."[1] It goes on to explain that it uses these cookies and tracking technologies to capture Private Communications from its users including your IP address, location, operating system, browser, browser language, address of referring websites, the URLs of any pages you visit on our websites and mobile apps, device identifiers, advertising identifiers, and other usage information."

33. The Privacy Notice also states that the Website uses third party cookies like those "set by other companies (such as Google) whose functionality is embedded into our sites." Third Parties like the Defendant's "digital and marketing vendors sometimes link data—inferred from your browsing of other sites or collected from other sources—using a method known as ID synching or cookie synching . . . [by] match[ing] the tracker ID they have assigned to you with one or more tracker IDs that are held in another company's database and that are likely also associated with you." That information "is then used to determine which ad to show you."

34. The Privacy Notice also describes four types of trackers that appear on the Website:

- **Essential trackers** required for our sites to operate. They allow you to navigate one of our sites and use its services and features (e.g., cookies that help you stay logged in). Without essential trackers, our sites will not run smoothly and our sites, or certain services or features, might not even be available to you simply because of technical limitations.

- **Preference trackers** allowing us to store information about your choices, settings and preferences. They also help us recognize you when you return to our sites, remember your language settings (among others) and customize our sites accordingly. They are not essential to the functioning of our sites.

---

[1] https://www.ashleyfurniture.com/privacy-policy (the "Privacy Notice").

Class Action Complaint

- **Analytics trackers** collecting or using information about your site use, which helps us improve our sites. Among the uses of analytics trackers are to show us which pages are most frequently visited, help us record difficulties you have with our sites, and track purchases and behaviors leading to purchases. These trackers add up our customers' visits to show us larger patterns in our customers' behavior. We look at these larger patterns to analyze site traffic.

- **Marketing trackers** help us determine which ads or content to show you, both on our sites and on other sites. To do this, these trackers use information about your behavior on various sites to target our ads and content. These trackers allow us to limit the number of times you see our ads and content across your devices. They help us personalize the ads and content we show you. They also enable us to measure the effectiveness of our marketing campaigns.

C.      **Defendant falsely told users that they could reject the Website's use of cookies.**

35.     When users in California visited the Website, it immediately displayed to them a pop-up cookie consent banner which stated that it used "cookies and session replay tools to collect real-

By using this site you agree to our use of cookies and session replay tools to collect real-time information about your use of our site. We use the information to optimize the performance of our website, enhance site navigation, analyze site usage, and assist in our marketing efforts.    Configure    Accept All Cookies

time information about your use of our site. We use the information to … assist in our marketing efforts."

10

Class Action Complaint

36.    Clicking on the "Configure" button presented another screen on which users could choose to reject some or all cookies:

37.    The Website described Functional Cookies as follows: "These cookies enable the



website to provide enhanced functionality and personalisation. They may be set by us or by third party providers whose services we have added to our pages. If you do not allow these cookies then some or all of these services may not function properly."

38.    The Website described Quantum Metric Recordings as follows: "By using this site you agree to our use of session replay tools to collect real-time information about your use of our site. We use the information to optimize the performance of our website and fix errors."

11

Class Action Complaint



39.    The Website described Performance Cookies as follows: "These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous. If you do not allow these cookies we will not know when you have visited our site, and will not be able to monitor its performance."



40.    The Website described Targeting Cookies as follows: "These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising."

12

Class Action Complaint



**— Targeting Cookies**

These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

41.     Plaintiffs and other Website users who clicked or selected the "Reject All" button indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, other than those cookies necessary for the functioning of the Website, could then continue to browse the Website, as the popup cookie consent banner disappeared.

42.     Defendant's popup cookie consent banner led Plaintiffs and similarly situated Website users to believe that they declined or rejected all cookies and tracking technologies, especially the Functional, Performance, and Targeting Cookies and Quantum Metric Recordings used to "assist in our marketing efforts."  The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Reject All Cookies" button.

43.     Defendant's representations were false. In truth, Defendant did not honor Plaintiffs' or other users' privacy choices. When Plaintiffs and other Website users clicked or selected the "Reject All" button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website. But even after receiving that notice, Defendant caused the Third Party cookies to be placed on Website users' browser and devices and/or transmitted to the Third Parties along with user data.

Class Action Complaint

44.     In particular, when users clicked or selected the "Reject All" button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

45.     The behavior of the third-party cookies deployed on the Website can be observed using network inspection tools that record browser communications. These tools allow examination of the outgoing HTTP requests made by the user's browser as it interacts with the Website. The following screenshots and exhibits, collected by plaintiffs' counsel using such a tool, demonstrate that third-party cookies were transmitted from the user's device to external third-party domains even after the user clicked the "Reject All" button on the Website's cookie consent banner—indicating that data sharing continued despite the user's expressed intent to opt out of tracking.

Class Action Complaint

◆ Gemini    —    ⬜    ✕

☆    🐙    </>    📷    ⬚    |    🔍    |    J    ⋮

▣  ⬚   Elements   Console   Sources   **Network**   Performance   Memory   Application   »   ⊗2 ⚠6 🗨2   ⟳   ⚙   ⋮   ✕

⏺ ⊘ | ▼. 🔍 | ☑ Preserve log | ☑ Disable cache   No throttling  ▼  📶  ⬆  ⬇    ⚙

☐ Big request rows    ☐ Group by frame

☐ Overview    ☐ Screenshots

| Name | Status | Domain | Cookies |
|---|---|---|---|
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 4 |
| dc_pre=CNeC9Z309pEDFToArQYdwA8iXw;src=9672265;type...%... | 200 | adservice.google.com | 3 |
| dc_pre=CLf5o5n09pEDFXvxwgQdxLY8hQ;src=9672265;type...ps... | 200 | adservice.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | (cance... | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| v2?type=json&tc=1 | 200 | us.creativecdn.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je6150h2v872895...... | (cance... | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je6150h2v872895...... | (cance... | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je6150h2v872895...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | (cance... | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | (cance... | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | (cance... | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | (cance... | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je6150h2v872895...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je6150h2v872895...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | (cance... | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...... | 204 | analytics.google.com | 3 |
| collect?v=2&tid=G-X9DRQWMD18&gtm=45je5cc1v87289514...i... | 204 | analytics.google.com | 3 |
| ct.html | 200 | ct.pinterest.com | 2 |
| ct.html | 200 | ct.pinterest.com | 2 |
| bat.js | 200 | bat.bing.com | 2 |
| bounce?%2Fsetuid%3Fentity%3D315%26code%3D3kvuOF89ujEl... | 200 | ib.adnxs.com | 2 |
| bat.js | 200 | bat.bing.com | 2 |
| bat.js | 200 | bat.bing.com | 2 |
| bat.js | 200 | bat.bing.com | 2 |
| token_create.js | 200 | ct.pinterest.com | 2 |

1752 / 2287 requests    45,334 kB / 58,048 kB transferred    98,342 kB / 137,430 kB resources    Finish: 9.2 min    DOMContentLoaded: 3.51 s    L

15

Class Action Complaint

16

Class Action Complaint

46.     The above screenshots show the Network tab of Chrome Developer Tools which reveals a detailed log of HTTP transmissions between the user's browser and various third-party domains while interacting with the Website. The screenshots depict only network traffic occurring after the user rejected all cookies.

47.     As shown above, even after the user chooses to "Reject all" cookies, the network activity shows that the user's browser continues to send GET and POST requests to third-party domains like analytics.google.com, doubleclick.net, p.cquotient.com, and ct.pinterest.com. These requests include transmission of cookies and other identifiers, enabling these third parties to receive data about the user's interactions with the site and Private Communications between the user and Defendant.

48.     As shown in the right hand column, the user's browser sent cookies along with these HTTP requests to third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after they

17

Class Action Complaint

declined or rejected all such cookies and tracking technologies by clicking or selecting the "Reject all" cookies button. All of these network calls are made to Third Parties without the user's knowledge and despite the user's explicit rejection of all cookies.

49. Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, geolocation data, and IP address are surreptitiously obtained by the Third Parties via these cookies.

50. Users who interact with the Website and reject cookies, including by selecting or clicking the "Reject all" button have chosen to decline the use of cookies and similar technologies for personalized content, advertising, analytics, or the sale or sharing of their personal information with third parties. Despite this rejection, additional data about users' behavior and communications is transmitted to third parties, along with cookie data. The third-party cookies that Defendant wrongfully permits to be stored on users' devices and transmitted to Third Parties allow those Third Parties to track and collect detailed information about users' behavior and communications on the Website, including their Private Communications.

51. Third-party cookies allow Third Parties to track users' behavior across websites and over time. This persistent tracking enables them to correlate and combine user data with other datasets to build comprehensive profiles that reflect consumers' behaviors, preferences, and demographics—including purchase intent, online behaviors, and interest categories. These profiles are monetized by Third Parties for advertising, sales, and marketing purposes. Advertisers use them to gain granular insights into users' behavioral characteristics and to deliver targeted advertisements tailored to users' profiles and audience segments.

52. The Third Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap because it allows the Third Parties—entities that are separate and distinct from the parties to the conversation (the user and the Defendant)—to intercept, access, and analyze communications between the user and the Website in real time. When executed, the Third Party code initiates outbound transmissions to the Third Parties' servers, capturing detailed information about the user's interactions with the Website, including page views, clicks, search queries, form inputs,

18

Class Action Complaint

and other behavioral and contextual data. This interception occurs without the user's knowledge or consent. Unlike a tool controlled by a party to the communication, the third-party code operates autonomously on behalf of outside entities who are not participants in the communication. These Third Parties are not mere passive recipients of data; they retain, process, and repurpose the intercepted communications for their own commercial benefit—such as behavioral profiling, targeted advertising, data monetization, and cross-site tracking as described in more detail below.

**D.    Defendant's conduct violated its own policy.**

53.    Defendant's aiding, agreeing with, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies—even after users rejected cookies, including by selecting or clicking the "Reject all" button—violates the written assurances it made to users.

54.    Defendant told users they could choose to reject functional, performance, and targeting cookies and Quantum Metric Recordings. Even after users chose to reject cookies (including by selecting "Reject all"), the Website disregarded those assurances by deploying the very tracking technologies it promised users they could reject—allowing Third Parties to continue collecting data and Private Communications from users' interactions on the Website.

55.    Defendant also told users that it "respects your privacy and the information that you have entrusted to us." But it does not respect its users' privacy choices and allows third parties to obtain, use, and monetize its users' information even after the users have expressly told Defendant that they reject some or all cookies and don't want their information disseminated.

**E.    The Website collected Private Communications by using Third Party cookies.**

56.    Plaintiff's counsel investigated the Website. That investigation showed that Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users reject cookies.

19

Class Action Complaint

57.    The Website allows users to search for particular items.



58.    When users input the information into the search bar, they intend to communicate the contents of their search directly to the Website.

59.    Instead, Defendant programmed the Website so that the contents of those communications are intercepted by the Third Parties while the communications are in transit between the user's browser and the Website.

60.    The Website causes consumers' search strings to be transmitted to Google, Zeta Global Advertising (live.rezync.com)[2], and LiveIntent (rp.liadm.com)[3] along with cookie data, even after consumers have rejected all non-necessary cookies.

61.    In the example below, the test string "ottoman" was sent to Google and Doubleclick:

_____

[2] Zeta Global describes itself as an "AI-Powered Marketing Cloud" that helps brands "acquire, grow, and retain customers" through data-driven marketing and advertising technology (Zeta Global, *Our Story*, https://zetaglobal.com/about/our-story/). It further explains that it uses cookies, pixels, device identifiers, and other tracking technologies to collect information about users' interactions across websites and devices in order to enable identity resolution, cross-channel targeting, and personalized advertising for marketers (Zeta Global, *Privacy Policy*, https://zetaglobal.com/privacy-policy/).

[3] LiveIntent describes itself as a people-based marketing and advertising platform that helps brands and publishers "activate their audiences" using identity-driven advertising across channels, including email and the open web (LiveIntent, *About Us*, https://www.liveintent.com/about/). Its privacy disclosures explain that it uses cookies, pixels, and unique identifiers to collect information about users' interactions across websites and devices, link those interactions to persistent identifiers, and enable cross-site targeting and measurement for advertisers (LiveIntent, *Privacy Policy*, https://www.liveintent.com/privacy-policy/).

Class Action Complaint

62. This network request included the IDE cookie:

63. Similar network requests to Zeta Global Advertising and LiveIntent also included the transmission of the "ottoman" search string along with third-party cookies.

64. The Website also allows the user to filter items based on various characteristics.

21

Class Action Complaint

65.    When users filter items, they intend to communicate the contents of their filter directly to the Website.



66.    Instead, Defendant programmed the Website so that the contents of those communications are intercepted by the Third Parties while the communications are in transit between the user's browser and the Website.

67.    For example, the Website causes consumers' filter criteria to be transmitted to at least Google and CQuotient—even after consumers have rejected all non-necessary cookies. For example, here is the network request sent to Cquotient:

22

Class Action Complaint



1. **Google and Doubleclick Cookies**

68.    Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users "Reject All Cookies" other than those necessary for the functioning of the Website to and from the www.google.com, analytics.google.com, googleads.g.doubleclick.net, and www.google-analytics.com domains.

69.    Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[4] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Over 16% of web traffic is tracked by Google's DoubleClick cookies.[5] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance.[6] Further, by identifying users who have shown interest in certain products or content, Google's cookies enable its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[7]

70.    Google sends cookies when a web user visits a webpage that shows ads served through Google Ad Manager or other Google Marketing Platform products, including those associated with DoubleClick.[8] When a page includes Google Marketing Platform or Google Ad Manager ad tags—even if no ads are displayed—these tags trigger requests to Google's ad servers, which can then set third--party cookies (via doubleclick.net) in the user's browser. According to

---

[4] https://business.safety.google/adscookies/ (Cookies "may be set from a few different domains, including google.com, doubleclick.net, googlesyndication.com, or googleadservices.com, or the domain of our partners' sites").
[5] *See, e.g.*, https://www.ghostery.com/whotracksme/trackers/doubleclick.
[6] https://developers.google.com/google-ads/api/docs/conversions/overview ("Conversion tracking provides key insights into users' actions after viewing or clicking an ad. You can keep track of users who call, buy a product, install a mobile app, and more."); *see* the Advertising, Analytics, and Personalization sections at https://policies.google.com/technologies/cookies?hl=en-US.
[7] https://policies.google.com/technologies/ads?hl=en-US ("[W]e may use cookies for a number of purposes, such as . . . to show ads that are likely to be more relevant").
[8] https://business.safety.google/adscookies/.

24

Class Action Complaint

Google, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers."[9]

71. Google also uses cookies in performing analytical functions. As Google explains, Google Analytics is a platform that collects data from websites and apps to create reports that provide insights.[10] To measure a website, a business must create a Google Analytics account and add a small piece of JavaScript measurement code to each page on its site.[11] Then, every time a user visits a webpage, the tracking code will collect information about how that user interacted with the page.[12] Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[13]

72. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data.

73. In this example, the user has visited a page on the Website that offers financing options. By visiting this page, the user is communicating to the Website that the user is interested in financing options, to "shop without using credit", and for a "flexible, lease-to-own solution." At this page, the Defendant, through the Website offers "24 months special financing."

---

[9] Google Ad Manager Help Page (https://support.google.com/admanager/answer/2839090) archived at https://archive.ph/wtE6h.

[10] Google Analytics Page (https://support.google.com/analytics/answer/12159447) archived at https://archive.ph/sv2LV.

[11] Google Analytics Page (https://support.google.com/analytics/answer/12159447) archived at https://archive.ph/sv2LV.

[12] Google Analytics Page (https://support.google.com/analytics/answer/12159447) archived at https://archive.ph/sv2LV.

[13] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

Class Action Complaint



74.    When the user navigates to this page offering financing through Acima, the Google software code that Defendant causes to be stored on and executed by the Website's user's device causes the following data to be sent to Google's domain at ad.doubleclick.net:

Class Action Complaint

| ✕ | Headers | Preview | Response | Initiator | Timing | Cookies |

▼ Request Headers

| | |
|---|---|
| :authority | ad.doubleclick.net |
| :method | GET |
| :path | /activity;dc_pre=CNKPgMX39pEDFbLmFggdhLAkJg;src=9672265;type=visit0;cat=af_lp0;ord=7851347761617;npa=0;auiddc=2131781467.1767702291;uaa=x86;uab=64;uafvl=Google%2520Chrome%3B143.0.7499.170%7CChromium%3B143.0.7499.170%7CNot%2520A(Brand%3B24.0.0.0;uamb=0;uam=;uap=Windows;uapv=19.0.0;uaw=0;pscdl=noapi;frm=0;_tu=IFA;gtm=45fe5cc1v9189986585za200zd9189986585xec;gcd=13l3l3l3l1l1;dma=0;dc_fmt=3;tag_exp=103116026~103200004~104527907~104528501~104573694~104684208~104684211~105391252~115583767~115616986~115938466~115938469~116184927~116184929~116251938~116251940;epver=2;dc_random=1767703189_SuMlIyeg61zfwN9G34tngiDJo0Xs0yKmUg;~oref=https%3A%2F%2Fwww.ashleyfurniture.com%2Ffinancing%2Facima%2F? |
| :scheme | https |
| Accept | */* |
| Accept-Encoding | gzip, deflate, br, zstd |
| Accept-Language | en-US,en;q=0.9 |
| Attribution-Reporting-Eligible | trigger=navigation-source |
| Attribution-Reporting-Support | web=os |
| Cache-Control | no-cache |
| Cookie | IDE=AHWqTUnihPHbQhHtbL9n5VdNvidP2xK4q8wKIPNBfrgtZ3-BOWPBS5YFdwfSQEw_BvQ |
| Pragma | no-cache |
| Priority | u=1, i |
| Referer | https://www.ashleyfurniture.com/ |
| Sec-Ch-Ua | "Google Chrome";v="143", "Chromium";v="143", "Not A(Brand";v="24" |
| Sec-Ch-Ua-Mobile | ?0 |
| Sec-Ch-Ua-Platform | "Windows" |
| Sec-Fetch-Dest | empty |
| Sec-Fetch-Mode | no-cors |
| Sec-Fetch-Site | cross-site |
| Sec-Fetch-Storage-Access | active |
| User-Agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/143.0.0.0 Safari/537.36 |
| X-Browser-Channel | stable |
| X-Browser-Copyright | Copyright 2025 Google LLC. All Rights reserved. |
| X-Browser-Validation | UujAs0GAwdnCJ9nvrswZ+O+oco0= |
| X-Browser-Year | 2025 |
| X-Client-Data | CJW2yQEIo7bJAQipncoBCPuNywEIlqHLAQiFoM0BCJKkzwE= |

27

75.    The Google software code that Defendant causes to be executed by the Website user's device causes the user's browser to send a request to a Google-controlled domain (securepubads.g.doubleclick.net). As a part of the network request, Google sets a cookie—the IDE cookie—on the user's browser:

| X   Headers   Preview   Response   Initiator   Timing   **Cookies** | | | | | |
|---|---|---|---|---|---|
| **Request Cookies**   ☐ show filtered out request cookies | | | | | |
| Name | Value | Domain | Path | Expires / Max-Age | |
| IDE | AHWqTUnihPHbQh... | .doubleclick.net | / | 2027-02-10T12:25:0... | |

76.    The IDE cookie is a small data file set by Google's advertising platform, DoubleClick. According to Google, it is an advertising cookie that lasts for 13 months.[14] It is used for these Google products: Campaign Manager, Display & Video 360, Google Ad Manager, Google Analytics, Search Ads 360.[15] Doubleclick automatically sends the IDE back whenever the browser makes a request to the doubleclick.net domain. In this instance, the value of the parameter is a persistent advertising identifier assigned to that browser. This tells DoubleClick that the same browser associated with that unique ID is making the request. Because the IDE cookie is sent whenever the browser loads DoubleClick resources on any participating website, it enables DoubleClick to recognize and track the same browser across different sites over time and associate browsing activity—including visits to financing pages—with the user's specific advertising profile.

77.    The IDE cookie contains a unique string of letters and numbers that functions as an identifier for the user's browser. This identifier enables Google's advertising services, through DoubleClick, to recognize the same browser across different websites that load DoubleClick ads or tracking pixels. The cookie was created on January 6, 2026, and is set to expire on February 10, 2027, meaning it remains on the user's device for more than one year unless manually deleted.

---

[14] Google's "Our Advertising and measurement cookies page" (https://business.safety.google/adscookies/) archived at https://archive.ph/ABkaT.

[15] Google's "Our Advertising and measurement cookies page" (https://business.safety.google/adscookies/) archived at https://archive.ph/ABkaT.

Class Action Complaint

78.     The network requests associated with the IDE cookie contain the following Private Communications:

    a. **Browsing history**: The ~oref parameter captures the exact web page the user is currently visiting—https://www.ashleyfurniture.com/financing/acima/. This discloses that the user navigated to a financing or lease-to-own page. The referer header further confirms that the request was initiated while the user was browsing within the Ashley Furniture website. Together, these fields allow DoubleClick to record the specific page viewed and the browsing context in which the event occurred.

    b. **Visit history**: The request path includes event-classification parameters such as type=visit0 which shows how many times the user has visited the page and in this context indicates a page-visit or landing-page event rather than a conversion, placing the user at a specific point in their on-site navigation. The referer header (https://www.ashleyfurniture.com/) indicates the page from which the tracking request was triggered, while ~oref identifies the precise financing page being viewed. When combined, these values allow DoubleClick to reconstruct how the user moved within the site and what content the user accessed during that session.

    c. **Website interactions**: The request path includes event-classification parameters such as cat=af_lp0, which categorize the page view as a specific advertising or conversion event. "cat=af_lp0" identifies the type of page or interaction (e.g., landing page), enabling analysis of what the user interacted with. Here, af stands for Ashley Furniture. , the advertiser identified by src=9672265. These parameters signal that a defined tracking event occurred on a particular landing page, enabling DoubleClick to log that behavioral action.

    d. **User input data**: The user has specifically navigated to this page which includes information about Acima and financing, information that is being sent to Google and Doubleclick.

    e. **Interests and preferences**: See browsing history and referring URL.

    f. **Shopping behaviors**: See browsing history and referring URL.

Class Action Complaint

g. **Device information**:  The request includes extensive browser identification data. The user-agent string discloses the exact browser (Chrome), version number, operating system (Windows NT 10.0), and device architecture (64-bit). The sec-ch-ua, sec-ch-ua-platform, and sec-ch-ua-mobile headers repeat and refine this information using modern client hints. The x-browser-channel header reveals the release track ("stable"), x-browser-year discloses the build year (2025), and x-client-data contains encoded Chrome experiment and configuration data that may vary across installations. Collectively, these parameters create a detailed technical profile of the device and browser that can function as a fingerprint when combined.

h. **Referring URL**: The referring URL is disclosed through the ~oref parameter and the referer header. In this request, the ~oref parameter contains the full URL of the page the user was viewing—https://www.ashleyfurniture.com/financing/acima/—which is a financing or lease-to-own page. The referer header indicates the broader site context from which the request was made. By transmitting the full financing-page URL to DoubleClick, the request communicates the specific subject matter of the user's activity, not merely that the user visited the retailer's site. When this page-level information is combined with persistent identifiers such as the IDE cookie and auiddc parameter, DoubleClick can associate that financing-page visit with a particular tracked browser and incorporate that activity into the user's cross-site advertising profile.

i. **Session information**: The request contains parameters that reflect the timing and context of a particular page-load event. For example, the dc_random parameter includes a timestamp-like value combined with a unique string, designed to uniquely identify that specific event instance and prevent caching. The ord parameter similarly functions as a unique event value to distinguish one page load from another. These values allow DoubleClick to differentiate and log individual page-view events within a browsing session.

j. **User identifiers**: The request transmits persistent identifiers that allow DoubleClick to recognize the same browser over time. Most notably, the cookie header includes the IDE

cookie value, a unique advertising identifier automatically sent with every subsequent request to DoubleClick and enables the company to directly recognize the same browser across different websites. The auiddc parameter functions as an additional advertising user or device identifier associated with DoubleClick's tracking infrastructure. These identifiers are specifically designed for user recognition and cross-site tracking. When DoubleClick receives these values, it can associate the financing-page visit with an existing advertising profile tied to that browser and link that activity to past and future browsing behavior involving the same identifiers.

79.    These Private Communications are being intercepted by Google and Doubleclick. The browser includes the IDE cookie in the request to DoubleClick. Its presence in the request confirms that the browser is sending a persistent user identifier back to Google, allowing DoubleClick to recognize and track the user across sessions and potentially across other websites.

80.    The data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

81.    Think about the financing page that the user visited. When a user visits a webpage offering financing, to "shop without using credit," or "flexible, lease-to-own" options, the user is communicating economically sensitive information beyond mere browsing activity. The visit signals potential credit constraints, cash-flow limitations, or reliance on installment payments, suggesting financial need or reduced access to traditional credit. By viewing "24 months special financing," the user also communicates interest in extended payment terms and sensitivity to affordability and monthly cost. This behavior indicates elevated purchase intent and allows the website—and any embedded third parties—to infer income level, financial stress, risk tolerance for debt, and eligibility for alternative or subprime financing products. When combined with identifiers such as cookies or device data, this interaction becomes part of a persistent behavioral profile reflecting the user's financial condition and purchasing power.

### 2. Cquotient cookies

Class Action Complaint

82.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users "Reject All Cookies" other than those necessary for the functioning of the Website to and from the cquotient.com and p.cquotient.com domains.

83.    These domains are associated with CQuotient, a digital commerce and advertising technology company that was acquired by Salesforce in 2014. Salesforce publicly announced that it acquired CQuotient to enhance its Commerce Cloud (then Demandware) capabilities in data-driven personalization and predictive intelligence.[16] CQuotient's technology was subsequently integrated into Salesforce Commerce Cloud's personalization and marketing infrastructure.

84.    Salesforce explains that Commerce Cloud enables retailers to use shopper data for personalization, predictive product recommendations, audience segmentation, and advertising activation across digital channels.[17] Salesforce further discloses that it uses cookies and similar tracking technologies to collect information about users' interactions with websites in order to support analytics, personalization, and advertising services.[18]

85.    Cquotient's cookies allow the platform to recognize a returning browser over time, associate it with prior browsing behavior (such as product views, category filtering, search activity, and purchases), and analyze user engagement patterns. Salesforce's commerce and personalization documentation explains that such behavioral data is used to create shopper profiles, segment audiences, measure campaign performance, and activate targeted advertising.[19]

86.    Cquotient's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data.

---

[16] https://www.salesforce.com/news/press-releases/2014/07/140710
[17] https://www.salesforce.com/products/commerce-cloud/overview/https://www.salesforce.com/commerce/cloud/
[18] https://www.salesforce.com/company/privacy/
[19] https://www.salesforce.com/marketing/personalization/https://www.salesforce.com/marketing/personalization/

32

Class Action Complaint

87.    In this example, the user has visited a page on the Website after filtering for a velvet, platform bed between $500 and $750.



88.    When the user navigates to this page, the Cquotient software code that Defendant causes to be stored on and executed by the Website's user's device causes the following data to be sent to Cquotient's domain at p.cquotient.com:

Class Action Complaint

| | |
|---|---|
| ✕  **Headers**  Payload  Preview  Response  Initiator  Timing  Cookies | |
| :authority | p.cquotient.com |
| :method | GET |
| :path | /pebble?tla=bbvd-Ashley-US&activityType=viewCategory&callback=CQuotient._act_callback3&cookieId=bcxbsYmrBImbsRlbaWxGYYw0xJ&userId=&emailId=&products=id%3A%3AB600003253-Master%7C%7Csku%3A%3A&categoryId=beds&refinements=%5B%7B%22name%22%3A%22facetMaterial%22%2C%22value%22%3A%22Velvet%22%7D%2C%7B%22name%22%3A%22facetType%22%2C%22value%22%3A%22Platform%22%7D%2C%7B%22name%22%3A%22facetType%22%2C%22value%22%3A%22Storage%22%7D%2C%7B%22name%22%3A%22priceMin%22%2C%22value%22%3A%22500.0%22%7D%2C%7B%22name%22%3A%22priceMax%22%2C%22value%22%3A%22750.0%22%7D%2C%7B%22name%22%3A%22curr%22%2C%22value%22%3A%22USD%22%7D%2C%7B%22name%22%3A%22Category%22%2C%22value%22%3A%22beds%22%7D%5D&personalized=false&sortingRule=Category%20Position%20and%20New%20Best%20Sellers&realm=BBVD&siteId=Ashley-US&instanceType=prd&queryLocale=default&locale=default&referrer=https%3A%2F%2Fwww.ashleyfurniture.com%2Fc%2Ffurniture%2Fbedroom%2F&currentLocation=https%3A%2F%2Fwww.ashleyfurniture.com%2Fc%2Ffurniture%2Fbedroom%2Fbeds%2Fplatform%2Bstorage%2F%3Fpmin%3D500.00%26pmax%3D750.00%26prefn1%3DfacetMaterial%26prefv1%3DVelvet&__cq_uuid=bcxbsYmrBImbsRlbaWxGYYw0xJ&__cq_seg=0~0.00!1~0.00!2~0.00!3~0.00!4~0.00!5~0.00!6~0.00!7~0.00!8~0.00!9~0.00&__fbp=fb.1.1767702263713.9945584288398863673&ls=true&_=1767702486876&v=v3.1.3&fbPixelId=__UNKNOWN__ |
| :scheme | https |
| Accept | */* |
| Accept-Encoding | gzip, deflate, br, zstd |
| Accept-Language | en-US,en;q=0.9 |
| Cache-Control | no-cache |
| Cookie | uuid=bcxbsYmrBImbsRlbaWxGYYw0xJ |
| Pragma | no-cache |
| Referer | https://www.ashleyfurniture.com/ |
| Sec-Ch-Ua | "Google Chrome";v="143", "Chromium";v="143", "Not A(Brand";v="24" |
| Sec-Ch-Ua-Mobile | ?0 |
| Sec-Ch-Ua-Platform | "Windows" |
| Sec-Fetch-Dest | script |
| Sec-Fetch-Mode | no-cors |
| Sec-Fetch-Site | cross-site |
| Sec-Fetch-Storage-Access | active |
| User-Agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/143.0.0.0 Safari/537.36 |

34

89.    Along with this data, the Cquotient software code that Defendant causes to be stored on and executed by the user's device causes the following cookie to be sent to and received from Cquotient:



90.    The Cquotient software code that Defendant causes to be executed by the Website user's device causes the user's browser to send a request to a Cquotient-controlled domain (p.cquotient.com). As a part of the network request, Cquotient sets a cookie—the uuid cookie—on the user's browser.

91.    The uuid cookie is a small data file set in connection with CQuotient infrastructure, which operates as part of Salesforce Commerce Cloud's personalization and marketing technology stack. The uuid functions as a persistent browser-level identifier. When a browser makes a request to a CQuotient-controlled domain such as p.cquotient.com, the uuid value is transmitted automatically along with the request.

92.    The uuid value serves as a unique identifier assigned to that browser, allowing the platform to recognize that the same browser is making subsequent requests over time. Because the identifier persists across sessions and is included whenever CQuotient resources are loaded, it enables the association of product views, category browsing, search refinements, and purchase-related activity with a single browser profile. That persistent linkage allows retailers using the Commerce Cloud ecosystem to analyze user behavior, segment audiences, measure marketing effectiveness, and activate targeted advertising or retargeting campaigns based on observed shopping activity.

93.    The network requests associated with the uuid cookie contain the following Private Communications:

Class Action Complaint

a. **Browsing history**: The request transmits that the user engaged in a "viewCategory" activity and browsed the "beds" category. It includes the full current URL of the page viewed, which reveals that the user navigated to bedroom furniture and filtered for platform and storage beds within a $500–$750 price range. It also includes the referring page (https://www.ashleyfurniture.com/c/furniture/bedroom/), allowing reconstruction of the user's navigation path from one page to the next. In addition, it includes the sorting rule ("Category Position and New Best Sellers"), showing how products were displayed during the session.

b. **Visit history**: The request contains a Unix epoch timestamp (_=1767702486876) that records the precise time the tracking event occurred. This allows the recipient to reconstruct when the user visited the page and, when combined with other events, how frequently the user returns. Also, see Browsing history, above.

c. **Website interactions**: The request transmits refinements selected by the user, including material (Velvet), bed type (Platform and Storage), and price range ($500–$750). These reflect active filtering and interaction with on-page tools. It also indicates that browser local storage was enabled (ls=true).

d. **User input data**: The refinements include user-selected minimum price (500.0), maximum price (750.0), material (Velvet), and product type (Platform). These values reflect information affirmatively chosen by the user while browsing.

e. **Interests and preferences**: By transmitting the selected refinements and category ("beds"), the request reveals the user's interest in velvet platform beds within a defined price range. It also includes internal segmentation data (_cq_seg), reflecting behavioral scoring or audience categorization associated with the user.

f. **Shopping behaviors**: The request includes a specific product identifier (id::B600003253), linking the browsing activity to a particular product. This allows tracking of product-level engagement and shopping intent.

g. **Device information**: The request headers shown below disclose detailed information about the user's device and browser environment. The User-Agent string identifies that

Class Action Complaint

the request originated from a Windows 10 operating system (Windows NT 10.0), running a 64-bit version of Google Chrome (Chrome/143.0.0.0) built on the Chromium engine and using the AppleWebKit rendering engine. The Sec-CH-UA header confirms the browser brand and version ("Google Chrome" v143 and "Chromium" v143), while Sec-Ch-Ua-Platform specifies that the operating system is Windows. The Sec-Ch-Ua-Mobile value of ?0 indicates the device is not a mobile device, meaning the request came from a desktop-class system. The Accept-Language header ("en-US,en;q=0.9") reveals the user's language preferences, identifying U.S. English as the primary locale. The Accept-Encoding header (gzip, deflate, br, zstd) discloses which compression formats the browser supports, reflecting technical browser capabilities. The Sec-Fetch headers (including Sec-Fetch-Site=cross-site, Sec-Fetch-Mode=no-cors, and Sec-Fetch-Dest=script) indicate that the request was made to load a script from a different domain, providing context about how the browser is interacting with third-party resources. Together, these headers reveal the user's operating system, browser type and version, device class (desktop vs. mobile), language settings, technical capabilities, cross-site context, and persistent browser identifier.

| Header | Value |
|---|---|
| Accept-Language | en-US,en;q=0.9 |
| Cache-Control | no-cache |
| Cookie | uuid=bcxbsYmrBImbsRlbaWxGYYw0xJ |
| Pragma | no-cache |
| Referer | https://www.ashleyfurniture.com/ |
| Sec-Ch-Ua | "Google Chrome";v="143", "Chromium";v="143", "Not A(Brand";v="24" |
| Sec-Ch-Ua-Mobile | ?0 |
| Sec-Ch-Ua-Platform | "Windows" |
| Sec-Fetch-Dest | script |
| Sec-Fetch-Mode | no-cors |
| Sec-Fetch-Site | cross-site |
| Sec-Fetch-Storage-Access | active |
| User-Agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/143.0.0.0 Safari/537.36 |

Class Action Complaint

h. **Referring URL**: See Browsing history, above.

i. **Session information**: The request transmits a unique browser identifier (cookieId=bcxbsYmrBlmbsRlbaWxGYYw0xJ) and a Commerce Cloud UUID (uuid with the same value), which function as session-level tracking identifiers. The timestamp parameter also marks the specific session event.

94.    **User identifiers**: The request includes persistent tracking identifiers (cookieId=bcxbsYmrBlmbsRlbaWxGYYw0xJ, uuid with the same value, and _fbp=fb.1.1767702263713.994558428839883673). These are unique, browser-level identifiers that function as digital ID numbers. Once assigned, they allow the receiving party to recognize the same browser across multiple page views, sessions, and—in the case of the Facebook Pixel browser identifier cookie—potentially across different websites that use the same tracking infrastructure. Even though the userId and emailId fields are empty in this instance, the persistent identifiers enable the tracker to build a continuous behavioral profile tied to that specific browser over time. If the user later logs in, makes a purchase, enters an email address, or interacts with another site using the same advertising network, those identifiers can be associated with real-world identifying information, thereby linking past anonymous browsing activity to an identifiable individual.

95.    These Private Communications are being intercepted by Cquotient.  The browser includes the uuid cookie in the request to Cquotient. Its presence in the request confirms that the browser is sending a persistent user identifier back to Cquotient, allowing Cquotient to recognize and track the user across sessions and potentially across other websites.

96.    The data sent to Cquotient contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

97.    And, in response to this network request, Cquotient sends a set-cookie instruction. This instruction directs the user's browser to create and store a cookie containing a unique identifier on the user's device, which the browser will automatically transmit back to Cquotient on future requests, thereby allowing Cquotient to recognize the same browser across page views and sessions and to associate subsequent browsing activity with that persistent identifier.

38

Class Action Complaint

Set-Cookie                              uuid=bcxbsYmrBImbsRlbaWxGYYw0xJ; Max-Age=34128000;
                                        Domain=.cquotient.com; Path=/; Expires=Fri, 05 Feb 2027
                                        12:28:06 GMT; Secure; SameSite=None

### 3. Pinterest cookies

98.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users "Reject All Cookies" other than those necessary for the functioning of the Website to and from the pinterest.com and ct.pinterest.com domains.

99.    Each of these domains is associated with Pinterest's digital advertising and analytics platform, which utilizes the Pinterest tag to collect user information via browser cookies and conversion tracking. This system assists Pinterest in performing data collection, behavioral analysis, and user retargeting to optimize ad delivery. Pinterest serves personalized ads and Promoted Pins to users based on their interests and off-site activity.

100.    The Pinterest tag specifically tracks whether users complete distinct actions—such as site visits, add-to-carts, or completed checkouts—after interacting with an ad, providing the conversion metrics advertisers use to measure campaign ROI. Furthermore, by identifying users who have shown interest in specific products or categories, Pinterest's cookies enable its platform to retarget those users with relevant content when they return to the Pinterest ecosystem.

101.    Pinterest's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data.

102.    In this example, the user has visited a page for the London Fog Corduroy Blanket.

Class Action Complaint



103. When the user navigates to this page, the Pinterest software code that Defendant causes to be stored on and executed by the Website's user's device causes the following data to be sent to Pinterest's domain at ct.pinterest.com:

Class Action Complaint



Class Action Complaint

104.    Along with this data, the Pinterest software code that Defendant causes to be stored on and executed by the user's device causes the following cookie to be sent to and received from Pinterest:

| Headers | Payload | Preview | Response | Initiator | Timing | Cookies |

**Request Cookies**    ☐ show filtered out request cookies

| Name | Value | Domain | Path | Expires / Max-Age | Size |
|---|---|---|---|---|---|
| _pinterest_ct_ua | TWc9PSZqUHVCaElz... | .ct.pinterest.com | / | 2027-01-06T12:25:3... | 208 |
| ar_debug | 1 | .pinterest.com | / | 2027-01-06T12:26:1... | 9 |

**Response Cookies**

| Name | Value | Domain | Path | Expires / Max-Age | Size |
|---|---|---|---|---|---|
| _pinterest_ct_ua | TWc9PSYyTk1WK3F... | ct.pinterest.com | / | 365 days | 322 |
| ar_debug | 1 | .pinterest.com | / | 365 days | 132 |

105.    The Pinterest software code that Defendant causes to be executed by the Website user's device causes the user's browser to send a request to a Pinterest-controlled domain (ct.pinterest.com and pinterest.com). As a part of the network request, Pinterest sets two cookies—_pinterest_ct_ua and ar_debug cookies—on the user's browser.

106.    Pinterest uses cookies "on the websites of partners who use Pinterest's Save button, Pinterest widgets, or ad tools like conversion tracking."[20]

107.    The _pinterest_ct_ua cookie is used to group a user's actions across different pages of a website when Pinterest cannot immediately match the visitor to a specific logged-in Pinterest user. It assigns a unique, pseudonymized ID to the browser to ensure that a sequence of actions (e.g., viewing a product, then adding it to a cart) is attributed to the same session for ad measurement.[21]

108.    The network requests associated with the uuid cookie contain the following Private Communications:

   a.  **Browsing history**: The request transmits both the current page and the immediately preceding page. Specifically, the parameter event=pagevisit confirms that a pageview occurred. The ad= payload contains "loc":"https://www.ashleyfurniture.com/p/london_fog_corduroy_blanket/A600084369.h

---

[20] https://policy.pinterest.com/en/cookies-archive
[21] https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies

Class Action Complaint

tml", which identifies the exact product page being viewed, and it separately contains "ref":"https://www.ashleyfurniture.com/p/jorlaina_queen_upholstered_panel_bed_with_ mirrored_dresser_and_nightstand/APG-B922B3-6P.html", which identifies the page the user visited immediately before. When a request transmits both the current URL (loc) and the referring URL (ref) in the same event, it necessarily reveals the order of pages the user navigated—here, from a specific bed product page to a specific blanket product page. This represents a record of the user's sequential browsing path and product-level movement across the site.

b. **Visit history**: The path string reveals visit history because it includes a time-linked event transmission that allows the recipient to place this pageview within a broader usage timeline. The parameter cb=1767702377454 functions as a timestamp-based cache-buster value, reflecting the precise moment the event was generated. The presence of event=pagevisit confirms that a discrete browsing event occurred at that time. In addition, tid=2620902677476 ties the event to a specific tracking configuration, enabling the tracker to associate this pageview with other events transmitted under the same tracking ID. Together, these values allow the recipient to sequence this visit chronologically and build a record of when and how often the user returns to the site, thereby contributing to a timeline of the user's visits over time. Also, see Browsing history, above.

c. **Website interactions**: The path string reveals website interactions because it records that a specific behavioral event occurred and ties that event to a particular product context. The parameter event=pagevisit confirms that the user triggered a pageview event. The ed= payload transmits structured interaction data associated with that event, including "product_name":"London Fog Corduroy Blanket", "product_id":["A600084369"], "product_price":59.99, and "product_quantity":"1", showing that the interaction involved viewing a specific retail item. The presence of ecm_enabled=true within the ad= payload further indicates that enhanced conversion measurement is active, meaning the interaction is being captured for advertising

Class Action Complaint

attribution purposes. Together, these elements show that the user engaged with a specific product page and that the interaction was instrumented and recorded for tracking and measurement.

d. **User input data**: See above.

e. **Interests and preferences**: The path string reveals inferred interests and shopping preferences by identifying the specific product viewed and its merchandising classification. The ed= payload includes "product_name":"London Fog Corduroy Blanket", "product_category":"Home Decor - Throw Pillows, Blankets, & Poufs - Blankets and Throws", and "product_price":59.99, showing that the user is browsing within the home décor textiles segment and engaging with soft furnishings. The "loc":"https://www.ashleyfurniture.com/p/london_fog_corduroy_blanket/A600084369.html" value confirms that the user navigated to that specific product page. When combined with the "ref":"https://www.ashleyfurniture.com/p/jorlaina_queen_upholstered_panel_bed_with_mirrored_dresser_and_nightstand/APG-B922B3-6P.html" field in the same request, the transmission reflects browsing activity across coordinated home furnishing items (bedroom furniture and decorative bedding), supporting the inference that the user is shopping within a particular aesthetic or home décor category.

f. **Shopping behaviors**: Shopping behaviors: The path reflects that the user actively viewed a specific product page for a "London Fog Corduroy Blanket," including its SKU and price ($59.99), which shows product-level consideration rather than general browsing. It places the product within a defined merchandising category ("Home Decor – Throw Pillows, Blankets, & Poufs – Blankets and Throws"), indicating engagement with a particular retail segment. The request also includes the referring product page—a bedroom furniture item—showing that the user moved between related home furnishing products during the same session. Together, this reveals cross-category shopping activity, exposure to a specific price point, and item-level evaluation behavior, all of which are commonly used to assess purchase intent and retargeting eligibility.

Class Action Complaint

g. **Device information**: As with the network requests described above, this Pinterest network request reveals the same detailed information about the user's browser and device as the network requests described above.

h. **Referring URL**: See Browsing history, above.

i. **Session information**: The path shows that a specific pageview occurred at a particular time and that it followed another product page during the same browsing session. By including both the current page and the referring page, it reflects continuous activity rather than an isolated visit. The time-linked value in the request allows the event to be placed in sequence with other activity from the same browser. Together, this situates the pageview within an ongoing session and allows the recipient to track the flow of activity during that visit.

j. **User identifiers**: The network request transmits cookie-based identifiers that allow the browser to be recognized across visits. Specifically, it includes ar_debug=1 and a _pinterest_ct_ua cookie containing a long encoded value. The _pinterest_ct_ua cookie is not tied to the product being viewed; it is a persistent identifier associated with the browser for Pinterest tracking purposes. Because cookies are stored in the user's browser and automatically sent with subsequent requests to the same tracking domain, this value enables the recipient to recognize the same device over time and link this pageview to prior or future browsing activity. In practical terms, the request is not anonymous—it carries a persistent browser-level identifier capable of supporting cross-session tracking.

109.    The data sent to Pinterest contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

110.    These Private Communications are being intercepted by Pinterest.  The browser includes the cookies in the request to Pinterest. Its presence in the request confirms that the browser is sending a persistent user identifier back to Pinterest, allowing Pinterest to recognize and track the user across sessions and potentially across other websites.

F.    **The Private Communications are valuable.**

45

Class Action Complaint

111. In the ordinary course of its business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and monetize for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

112. The Private Communications that the Third Parties track and collect by way of the cookies on the Website are commercially valuable to both Defendant and the Third Parties. Defendant can use the data to measure the performance of its advertising campaigns, assess which features or listings are generating interest, and refine its inventory and user interface accordingly. The behavioral data also enables Defendant to segment users based on their preferences—such as brand, price range, or material like velvet—and deliver targeted ads to those users both on and off the Website. The third-party cookies also enable Defendant to target online advertisements to users when they visit other websites, for similar products both on the Website and across unrelated third-party websites.

113. The Third Parties, including ad platforms like Google, benefit by using the data to create detailed user profiles that persist across browsing sessions and devices. These profiles are used in real-time ad auctions to identify and bid on users who are most likely to convert. For example, if a user browses beds on the Website, that behavior is logged and monetized through higher-value ad placements as that user continues browsing elsewhere. The ability to retarget users across websites, attribute ad performance, and serve tailored content is critical to the digital advertising ecosystem— and it depends on collecting the user's communications with the Website in real time.

114. Data about users' browsing behavior allows Defendant to identify patterns in how users interact with the Website and what types of furniture they are interested in—such as specific brands, materials, features, or price ranges. At a broader level, this information gives Defendant insight into consumer trends across its inventory and the home furnishing market as a whole. By collecting and analyzing this data, Defendant is able to refine its marketing strategies, optimize vehicle listings and search results, and increase the profitability of the Website.

115.    The value of Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Empirical studies demonstrate the value of personal data. When tracking is unavailable—i.e., when users can't be uniquely identified—ad prices drop between 18% and 23% on average, reducing publisher revenue accordingly.[22] The effect is particularly acute for publishers like Defendant "offering content on . . . lifestyle & shopping."[23] The National Advertising Institute found that behaviorally targeted ads were more than twice as valuable as non-targeted ads.[24]

116.    67% of US adults turn off cookies or website tracking to protect their privacy.[25]

117.    Through its false representations and aiding, agreeing with, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

**G.    Plaintiff Jessica Luu.**

118.    In or around January 2026, Plaintiff Jessica Luu visited the Website because she was thinking about buying a dining table.

119.    When Ms. Luu visited the Website, it immediately presented her with Defendant's popup cookie consent banner, which provided the option to select the "Reject all" cookies button. Ms. Luu viewed Defendant's representation on the popup cookie consent banner that it used "cookies and session replay tools to collect real-time information." She also viewed Defendant's representation that she could "Reject All" cookies by clicking the button on the pop up.

120.    Consistent with her typical practice of rejecting or otherwise declining the placement or use of cookies and tracking technologies, Ms. Luu selected and clicked the "Reject All" button.

---

[22] https://arxiv.org/abs/2303.10906 (last accessed February 13, 2026).
[23] *Id.*
[24] https://thenai.org/wp-content/uploads/2021/07/PR03242010.pdf (last accessed February 13, 2026).
[25] https://www.emarketer.com/content/majority-of-us-adults-will-turn-off-cookies-manage-privacy-online (last accessed February 13, 2026) archived at https://archive.ph/zqWZL; https://www.cookieyes.com/blog/internet-cookie-statistics/ (last accessed February 13, 2026) archived at .

Class Action Complaint

Ms. Luu believed that selecting the "Reject All" button on the popup cookie consent banner found on the Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (including those that cause the disclosure of user data to third-party social media, advertising, and/or analytics companies for the purposes of providing personalized content, advertising, and analytic services).

121. In selecting the "Reject All" cookies button, Ms. Luu informed Defendant that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Ms. Luu specifically rejected, based on Defendant's representations, those cookies that shared her personal information with Defendant's social media, advertising and analytics partners. In reliance on these representations and promises, only then did Ms. Luu continue browsing the Website.

122. Then, as Ms. Luu continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Ms. Luu's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, and analytics services from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Ms. Luu's Private Communications as she browsed the Website.

123. Here is a screenshot of Ms. Luu's browser history. Search history showing visits to visits other than the Website have been redacted.



49

124. After selecting the "Reject All" cookies button, Ms. Luu personally engaged in specific, substantive communications with the Website. Specifically, she utilized the Website's search function to input searches for various tables. She then affirmatively clicked on specific product listings to view detailed product pages, including a product page for a coffee table set and a product page for a dining table set.

125. When Ms. Luu affirmatively inputted her search queries and navigated to these specific product pages on the Website, she intended to communicate the contents of those queries and interactions directly and exclusively to Defendant. However, despite her rejection of cookies, Defendant caused the Third Parties' software code to be executed on Ms. Luu's device. As Ms. Luu communicated her search queries and viewed the coffee table and dining table sets, Defendant caused the contents of those communications to be intercepted by Third Parties—including Google, CQuotient, and Pinterest—while the communications were in transit between her browser and the Website.

126. Furthermore, in facilitating these outgoing communications on January 11, 2026, Defendant caused the Third Parties' software to track and record the specific dialing, routing, addressing, and signaling information for Ms. Luu's session, including capturing her IP address, browser and device information (user-agent strings), and the specific referring URLs and destination URLs that mapped her navigation to the coffee table and dining table sets.

127. Defendant's representations that consumers could "Reject All" cookies while Ms. Luu and users browsed the Website, or at least those involved in providing personalized content, advertising, and analytics services, were untrue. Had Ms. Luu known this fact, she would not have used the Website. Moreover, Ms. Luu reviewed the popup cookie consent banner and Privacy Notice prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Ms. Luu would have noticed it and would not have used the Website.

128. Ms. Luu continues to desire to browse content featured on the Website. Ms. Luu would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all cookies and

Class Action Complaint

tracking technologies, Ms. Luu would browse the Website again in the future, but will not do so until then. Ms. Luu regularly visits websites that feature content similar to that of the Website. Because Ms. Luu does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all cookies and tracking technologies, Ms. Luu will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by developers.

**H.      Plaintiff Kelly Escobedo.**

129.    In or around November 2025, Plaintiff Kelly Escobedo visited the Website because she was thinking about buying a dining table.

130.    When Ms. Escobedo visited the Website, it immediately presented her with Defendant's popup cookie consent banner, which provided the option to select the "Reject All" cookies button. Ms. Escobedo viewed Defendant's representation on the popup cookie consent banner that it used "cookies and session replay tools to collect real-time information." She also viewed Defendant's representation that she could "Reject All" cookies by clicking the button on the pop up.

131.    Consistent with her typical practice of rejecting or otherwise declining the placement or use of cookies and tracking technologies, Ms. Escobedo selected and clicked the "Reject All" button. Ms. Escobedo believed that selecting the "Reject All" button on the popup cookie consent banner found on the Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (including those that cause the disclosure of user data to third-party social media, advertising, and/or analytics companies for the purposes of providing personalized content, advertising, and analytic services).

132.    In selecting the "Reject All" cookies button, Ms. Escobedo informed Defendant that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Ms. Escobedo specifically rejected, based on Defendant's representations, those

51

cookies that shared her personal information with Defendant's social media, advertising and analytics partners. In reliance on these representations and promises, only then did Ms. Escobedo continue browsing the Website.

133.    Then, as Ms. Escobedo continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Ms. Escobedo's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, and analytics services from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Ms. Escobedo's Private Communications as she browsed the Website.

134.    Here is a screenshot of Ms. Escobedo's browser history.

135.    After selecting the "Reject All" cookies button, Ms. Escobedo personally engaged in specific, substantive communications with the Website across two separate days. On November 9, 2025, Ms. Escobedo communicated with the Website by affirmatively navigating to and viewing a specific product page for a table. On November 10, 2025, Ms. Escobedo returned to the Website and

Class Action Complaint

communicated her interest by affirmatively navigating to and viewing a specific product page for a Tavern set.

136.    When Ms. Escobedo navigated to these specific product pages, she intended to communicate the contents of her interactions directly and exclusively to Defendant. However, despite her rejection of cookies, Defendant caused the contents of her communications—specifically her navigation to and viewing of the table and the Tavern set—to be intercepted by Third Parties while the communications were in transit between her browser and the Website.

137.    Furthermore, during her visits on November 9 and 10, 2025, Defendant caused the Third Parties' software to track and record the specific dialing, routing, addressing, and signaling information for Ms. Escobedo's outgoing communications, including capturing her IP address, user-agent strings, and the specific referring and destination URLs that routed her to the table and Tavern set product pages.

138.    Defendant's representations that consumers could "Reject All" cookies while Ms. Escobedo and users browsed the Website, or at least those involved in providing personalized content, advertising, and analytics services, were untrue. Had Ms. Escobedo known this fact, she would not have used the Website. Moreover, Ms. Escobedo reviewed the popup cookie consent banner and Privacy Notice prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Ms. Escobedo would have noticed it and would not have used the Website.

139.    Ms. Escobedo continues to desire to browse content featured on the Website. Ms. Escobedo would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all cookies and tracking technologies, Ms. Escobedo would browse the Website again in the future, but will not do so until then. Ms. Escobedo regularly visits websites that feature content similar to that of the Website. Because Ms. Escobedo does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all cookies and tracking technologies, Ms. Escobedo will be

Class Action Complaint

unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by developers.

**V.      Class action allegations.**

140.    Plaintiffs bring the asserted claims on behalf of this proposed class:

141.    California Class: All persons who browsed the Website in the state of California after rejecting some or all cookies within the applicable statute of limitations (subject to any applicable tolling) (the "Class Period").

142.    The following people are excluded from the class: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

*Numerosity*

143.    The proposed class contains members so numerous that separate joinder of each member of the class is impractical.  As described above, most US adults reject cookies. Plaintiffs estimate that there are tens or hundreds of thousands of class members.

*Predominance of Common Questions*

144.    This action involves common questions of law and fact to the Class because each Class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not allow third-party cookies to be placed on Class members' browsers or devices, transmit user data to third parties, or permit third parties to track or collect Class members' Private

Class Action Complaint

Communications after Class members chose to reject cookies and tracking technologies on the Website.

145. Common questions of law and fact include, without limitation:

(1) whether Defendant's Website honored the choices of the users of its Website to reject cookies;

(2) whether Defendant's actions violate the California laws asserted here; and

(3) whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

**Typicality & Adequacy**

146. Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected cookies, and had their confidential Private Communications intercepted by the Third Parties. There are no conflicts of interest between Plaintiffs and the Class.

147. Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

**Superiority**

148. A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical.  It would be

55

Class Action Complaint

unduly burdensome to have individual litigation of thousands or millions of individual claims in separate lawsuits, every one of which would present the issues presented in this lawsuit.

## VI.     Claims.

### First Cause of Action:

### Invasion of Privacy

149.    Plaintiffs incorporate each and every factual allegation set forth above.

150.    Plaintiffs bring this cause of action on behalf of themselves and the Class.

151.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

152.    Plaintiffs and Class members had legally protected privacy interests under the following: (i) the California Invasion of Privacy Act, as alleged here; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged here; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy. Defendant intruded upon these legally protected privacy interests of Plaintiffs and Class members.

153.    Plaintiffs and Class members had a reasonable expectation of privacy because Defendant affirmatively promised users they could reject cookies and tracking technologies before browsing the Website. Plaintiffs and other Class members used the Website and, when presented with Website's consent banner, rejected cookies. Plaintiffs and other Class members reasonably expected that their rejection of cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors,

56

Class Action Complaint

device information, referring URLs, session information, user identifiers, geolocation data, and IP address.

154. Such information (e.g., the Private Communications) is "personal information" under California law, which defines personal information as including "[c]ommercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies" and "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

155. Defendant's actions constituted a serious invasion of privacy accomplished, *inter alia*, through their deception of Plaintiffs and other Class members, who were falsely told that Third Party cookies would not be used. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, knowingly permitted and substantially assisted the Third Parties to use cookies and other to invade the Plaintiffs privacy though tracking technologies to collect, track, and compile users' Private Communications. The data that Defendant knowingly allowed and substantially assisted third parties to collect enables the Third Parties to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as "new homeowners," "movers," or "budget-conscious furniture shoppers,"); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, thereby harming them by depriving them of control over their personal information and the ability to decide how it is shared or used.

156. Defendant's actions invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications) and violated criminal laws on wiretapping and invasion of privacy. By offering users a choice to reject cookies and then ignoring its users' preferences, Defendant committed a serious invasion of privacy by deliberately and knowingly undermining

Class Action Complaint

users' control over their personal data, surreptitiously harvesting sensitive information despite explicit instructions to the contrary, and fostering a false sense of security that led users to believe their browsing activity would remain private when, in fact, it was being shared with third parties.

157. Defendant did not have a legitimate business interest in ignoring the results of a choice (to reject cookies) that it presented to users.

158. These acts constitute an egregious breach of social norms that is highly offensive. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

159. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

160. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

161. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## Second Cause of Action:

## Intrusion upon Seclusion

162. Plaintiffs incorporate each and every factual allegation set forth above.

163. Plaintiffs bring this cause of action on behalf of themselves and the Class.

164. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

165. As described above, Defendant intruded into a place (its Website) and a conversation (the Private Communications between Plaintiffs and Class members and Defendant) where Plaintiffs and Class members had a reasonable expectation of privacy.

166. Defendant explicitly offered users the option to reject cookies—a clear acknowledgment that users could choose not to be tracked. By accepting this offer and rejecting cookies, users communicated their intent to browse privately and without third-party surveillance. Defendant's conscious decision to ignore those preferences and deceive Plaintiffs and the Class members by allowing third-party tracking anyway meant that it enabled and substantially assisted outsiders to access and monitor users' interactions with the Website—Private Communications that users reasonably expected would remain confidential. This surreptitious override of user consent invaded the private digital space users were misled to believe was protected.

167. Defendant knowingly placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized. In other words, Defendant allowed Third Parties to intercept and read communications without permission.

168. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could reject cookies, the fact that they chose to reject cookies, as well as state criminal and civil laws designed to protect individual privacy.

169. Defendant's conduct is highly offensive to a reasonable person because it knowingly bypassed users' privacy choices, deceived users, exposed Private (and sensitive) Communications, violated reasonable expectations of privacy, and caused Plaintiffs and the Class members to engage in tracked conduct they otherwise would not have undertaken.

170. Defendant's conduct was intentional. The Website's behavior is the direct result of code Defendant either developed, implemented, or authorized. When a user rejects some or all cookies on a cookie banner, that input triggers specific logic in the site's code—logic that determines whether tracking technologies are blocked or allowed. If cookies continue to be set after rejection, it means the website's code is configured to permit that behavior. Website owners are responsible for reviewing and testing their site's functionality, including privacy features. There are a number of tools available (including tools more powerful than the Developer Tools functionality in the Chrome browser) to indicate when cookies are being deployed and under what conditions.

Class Action Complaint

171.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

172.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

173.    Plaintiffs and Class members seek punitive damages because Defendant's actions— which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Third Cause of Action:

### Wiretapping in Violation of the California Invasion of Privacy Act

### (California Penal Code § 631)

174.    Plaintiffs incorporate each and every factual allegation set forth above.

175.    Plaintiffs bring this cause of action on behalf of themselves and the Class.

176.    The California Legislature has declared "that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

177.    California Penal Code § 631(a) prohibits wiretapping:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . , or who aids, agrees with, employs, or conspires with any person or

persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

178. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

179. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

a. Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

b. Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

c. Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

180. Defendant did all of those. In other words, it engaged in each type of prohibited conduct described above. The means and methods by which Defendant did so were the same: it offered Plaintiffs and Class members the choice to reject cookies. But after users exercised that choice, Defendant ignored their selections and continued to deploy third-party cookies and tracking technologies which transmitted Plaintiffs' and Class members' Private Communications with

61

Defendant—such as what they searched for, clicked on, and viewed—to the Third Parties without users' knowledge or consent.

181. By configuring the Website in this manner,

a. Defendant intentionally aided, agreed with, and/or conspired with the Third Parties to electrically and otherwise wiretap and make unauthorized connections of Private Communications intended to be between Plaintiffs and Class members, on one hand, and Defendant on the other. It did so by embedding Third Party tracking code into its Website that caused users' browsers to initiate real-time data transmissions to the Third Parties during user interactions with the site, enabling those entities to intercept, record, and analyze the substance of users' Private Communications without consent.

b. Defendant willfully and without the consent of Plaintiffs and Website users also aided, agreed with, and/or conspired with the Third Parties to read, attempt to read, or learn the contents or meaning of Private Communications while in transit and passing over the Internet in an unauthorized manner while the electronic communications were in transit or were being sent from or received at any place within California.

c. Defendant aided, agreed with, and/conspired with the Third Parties to use or attempt to use the data that it surreptitiously obtained from Plaintiffs and Class members.

182. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications. As specifically alleged above, this includes the contents of Plaintiff Luu's searches for various tables and her interactions with coffee and dining table sets on January 11, 2026, as well as the contents of Plaintiff Escobedo's interactions with a table and a Tavern set on November 9 and 10, 2025. These contents of these intercepted communications revealed among other things, browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

183. Defendant is a "person" within the meaning of California Penal Code § 631.

62

Class Action Complaint

184. Each of the Third Parties is a separate legal entity and not a passive recipient of the Private Communications. Each had the capability to use the wiretapped information for its own purposes and, as alleged above, did in fact use the wiretapped information for their own business purposes.

185. Defendant cannot show it had the consent of Plaintiffs and Class members. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject cookies in the consent banner.

186. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

187. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy; (ii) loss of value in their Private Communications; and (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

188. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the

63

greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

189.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to consumer products sold by Defendant. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action:**

**Use of a Pen Register in Violation of the California Invasion of Privacy Act**

**(California Penal Code § 638.51)**

190.    Plaintiffs incorporate each and every factual allegation set forth above.

191.    Plaintiffs bring this cause of action on behalf of themselves and the Class.

192.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

193.    Defendant is a person as defined by CIPA.

194.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" within the meaning of CIPA. They are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information" for specific outgoing communications. For example, when Plaintiff Luu searched for tables and viewed specific table sets, and when Plaintiff Escobedo viewed a table and a tavern set, the pen registers captured the

Class Action Complaint

IP addresses, user-agent information, and specific destination and referring URLs transmitted by Plaintiffs' computers and devices for those specific electronic communications.. Cal. Penal Code § 638.50(b).

195. At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information.

196. Some of the information collected by the Third Parties, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class's electronic communications with Defendant.

197. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking the "Reject All" cookies button in the cookie consent banner.

198. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class members' IP addresses and user-agent information.

199. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

200. Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a). Penal Code § 637.2(a)(1).

**Fifth Cause of Action:**

**Common Law Fraud, Deceit, and/or Misrepresentation**

201. Plaintiffs incorporate each and every factual allegation set forth above.

202. Plaintiffs bring this cause of action on behalf of themselves and the Class.

203. As alleged in detail above, Defendant made false representations and material omissions of fact to Plaintiffs and Class members concerning the ability to reject cookies.

204. These representations were false.

65

Class Action Complaint

205. When Defendant made these misrepresentations, it knew that they were false at the time that they made them and/or acted recklessly in making the misrepresentations.

206. Defendant intended that Plaintiffs and Class members rely on these representations and Plaintiffs read and reasonably relied on them.

207. Class-wide reliance can be inferred because Defendant's representations were material. A reasonable consumer would consider them important in deciding whether to reject cookies and navigate the Website.

208. Defendant's actions were a substantial factor and proximate cause in causing damages and losses to Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

209. Plaintiffs and the Class members suffered actual monetary loss and economic injury as a direct and proximate result of Defendant's fraudulent conduct. Had Plaintiffs known they could not reject cookies, they would not have used the Website or would have used the Website differently. Furthermore, because Plaintiffs' browsing histories, user interactions, and Private Communications carry financial value in the digital data market, Defendant's surreptitious interception and transmission of this data deprived Plaintiffs of their property right to control its dissemination. This unauthorized collection resulted in the measurable diminution of the value of Plaintiffs' and Class members' private and personally identifiable information and inhibited their ability to safely participate in that market or otherwise monetize their own data. Punitive damages are warranted to deter Defendant from engaging in future misconduct

## Sixth Cause of Action:

### Unjust Enrichment

210. Plaintiffs incorporate each and every factual allegation set forth above.

211. Plaintiffs bring this cause of action on behalf of themselves and the Class.

212. As alleged in detail above, Defendant's false and misleading promise to allow users to reject cookies caused Plaintiffs and Class members to use the Website and communicate with it, revealing information about themselves that Defendant and Third Parties could use, monetize, and profit from.

66

Class Action Complaint

213.    In this way, Defendant received a direct and unjust benefit at Plaintiffs' expense.

214.    Plaintiffs and the Class plead this claim in the alternative to their other claims.

215.    Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

## VII.    Relief.

216.    Plaintiffs seek the following relief for themselves and the proposed class:

- An order certifying the asserted claims, or issues raised, as a class action;
- A judgment in favor of Plaintiffs and the proposed class;
- Damages in excess of $75,000.00 in an amount to be calculated by the jury;
- Statutory damages where available, treble damages, and punitive damages where applicable;
- Restitution;
- Disgorgement, and other just equitable relief;
- Pre- and post-judgment interest;
- An injunction prohibiting Defendant's deceptive conduct, as allowed by law;
- Reasonable attorneys' fees and costs, as allowed by law;
- Any additional relief that the Court deems reasonable and just.

## VIII.    Demand for Jury Trial.

217.    Plaintiffs demand the right to a jury trial on all claims so triable.

Dated: March 31, 2026

Respectfully submitted,

By: */s/ Vivek Kothari*
Vivek Kothari (Cal. Bar No. 262842)
vivek@kothari.law
KOTHARI LAW
555 SE Martin Luther King Blvd.
Portland, OR 97214
Telephone: 503-567-6735

67

Class Action Complaint

*Attorney for Plaintiffs*

Class Action Complaint