**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Hayley A. Reynolds (State Bar No. 306427)
hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

**KOTHARI LAW**
Vivek Kothari (Cal. Bar No. 262842)
vivek@kothari.law
555 SE Martin Luther King Blvd., Suite 3022
Portland, OR 97214
Telephone: (503) 567-6735

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JESSICA LUU, KELLY ESCOBEDO, SHERI TUCKER and MEGAN DRISCOLL, individuals, on behalf of themselves, the general public, and those similarly situated,

Plaintiffs,

v.

ASHLEY GLOBAL RETAIL, LLC,

Defendant.

CASE NO. 5:2026-cv-02806-BLF

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**

Date: Thursday, December 17, 2026
Time: 9:00 a.m.
Courtroom: 1 (5th floor)
Judge: Hon. Beth Labson Freeman

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 1

III. ARGUMENT .......... 3

A. Plaintiffs' Claims Are Not Time-Barred. .......... 3

B. Plaintiffs Have Standing. .......... 5

1. Loss of Control Over One's Own Information Is an Injury in Fact .......... 5

2. Plaintiffs' Alleged Injuries Satisfy *Popa*. .......... 7

3. Defendant's Arguments Fail on the Pleadings .......... 9

C. Plaintiffs Sufficiently Allege Privacy Claims. .......... 10

1. Plaintiffs Had a Reasonable Expectation of Privacy. .......... 10

2. Defendant's Intrusion Was Highly Offensive .......... 11

1. The Website Intercepted the Content of User Communications .......... 14

2. The Website Intercepted Users' Communications While In Transit. .......... 15

4. Defendant Aided and Abetted a Violation of Section 631(a). .......... 16

D. Plaintiffs State a Claim Under Section 638.51 of CIPA. .......... 18

E. Plaintiffs' Fraud Claims Satisfy Rule 9(b) .......... 20

1. Plaintiffs Sufficiently Alleged Knowledge and Intent. .......... 20

2. Plaintiffs Sufficiently Alleged Damages .......... 22

F. Plaintiffs State a Claim for Unjust Enrichment. .......... 24

IV. CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Cases**

*Barrales v. Reckitt Benckiser LLC*, 2026 U.S. Dist. LEXIS 171400 (N.D. Cal. July 31, 2026) .......... passim
*Blake v. Dierdorff*, 856 F.2d 1365 (9th Cir. 1988) .......... 20
*Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110 (N.D. Cal. 2020) .......... 16
*Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. 2023) .......... 14
*Byars v. Tire*, 654 F. Supp. 3d 1020 (C.D. Cal. 2023) .......... 15
*D'Antonio v. Smith & Wesson Inc*., 820 F. Supp. 3d 928 (N.D. Cal. 2026) .......... 12, 13
*De Ayora v. Inspire Brands, Inc.*, 2026 U.S. Dist. LEXIS 126682 (N.D. Cal. June 8, 2026) .......... 19
*Doe v. Amgen, Inc.*, 2024 U.S. Dist. LEXIS 144579 (C.D. Cal. Aug. 13, 2024) .......... 17
*Doe v. Fullstory, Inc.*, 712 F. Supp. 3d 1244 (N.D. Cal. 2024) .......... 4
*Doe v. Xytex Corp*., 2017 U.S. Dist. LEXIS 43623 (N.D. Cal. Mar. 24, 2017) .......... 21
*Durnford v. MusclePharm Corp*., 907 F.3d 595 (9th Cir. 2018) .......... 4
*Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017) .......... 6, 7, 8
*ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023 (9th Cir. 2016) .......... 20
*Esparza v. UAG Escondido A1 Inc.*, 2024 U.S. Dist. LEXIS 24429 (S.D. Cal. Feb. 12, 2024) .......... 16
*Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797 (2005) .......... 4
*Freeman v. Indochino Apparel, Inc.*, 443 F. Supp. 3d 1107 (N.D. Cal. 2020) .......... 25
*Gabrielli v. Haleon US, Inc.*, 815 F. Supp. 3d 852 (N.D. Cal. 2025) .......... passim
*Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836 (N.D. Cal. July 14, 2025) 9, 12, 17, 22
*Goldstein v. Rumble Inc.*, 2026 U.S. Dist. LEXIS 113489 (C.D. Cal. Apr. 24, 2026) .......... 14, 15
*Graham v. Noom, Inc.*, 533 F. Supp. 3d 823 (N.D. Cal. 2021) .......... 13
*Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......... 18
*Harper v. Silver*, 200 Cal. App. 2d 103 (1962) .......... 20, 21
*Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849 (C.D. Cal. 2024) .......... 14
*Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272 (2009) .......... 8, 9, 11
*Hernandez-Silva v. Instructure, Inc.*, 2025 WL 2233210 (C.D. Cal. Aug. 4, 2025) .......... 23, 25
*In re Clorox Consumer Litig.*, 894 F.Supp.2d 1224 (N.D. Cal. 2012) .......... 22
*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) .......... passim
*In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019) .......... 12
*In re Google Assistant Priv. Litig.*, 546 F. Supp. 3d 945 (N.D. Cal. 2021) .......... 22
*In re Google Location Hist. Litig.*, 514 F. Supp. 3d 1147 (N.D. Cal. 2021) .......... 9, 12
*In re iPhone Application Litig.*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012) .......... 13
*In re Meta Android Priv. Litig.*, 2026 WL 1279416 (N.D. Cal. May 11, 2026) .......... 20
*In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147 (N.D. Cal. 2025) .......... 19, 20
*In re Zynga Priv. Litig.*, 750 F.3d 1098 (9th Cir. 2014) .......... 14
*In re: Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113 (N.D. Cal. 2018) .......... 22
*J.S. v. Spring Fertility Holdings, LLC*, 2026 U.S. Dist. LEXIS 117312 (N.D. Cal. May 27, 2026) .......... 16
*James v. Walt Disney Co*., 701 F. Supp. 3d 942 (N.D. Cal. 2023) .......... 17
*Jones v. Peloton Interactive, Inc.*, 720 F. Supp. 3d 940 (S.D. Cal. 2024) .......... 13
*Junhan Jeong v. Nexo Fin. LLC*, 2022 U.S. Dist. LEXIS 10089 (N.D. Cal. Jan. 19, 2022) .......... 25
*Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928 (N.D. Cal. 2023) .......... 12, 24

*Kotlarsz v. Integrity Vehicle Servs., Inc.*, 2024 U.S. Dist. LEXIS 213565 (C.D. Cal. Sep. 3, 2024) ... 17
*Lewis v. Magnite, Inc.*, 2025 WL 3687546 (C.D. Cal. Dec. 4, 2025) ... 16
*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) ... 25
*Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012) ... 13, 25
*Magliocca v. United Healthcare Servs.*, 2026 WL 878694 (E.D. Cal. Mar. 31, 2026) ... 23
*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) ... 7
*Miller v. Nat'l Broad. Co.*, 187 Cal. App. 3d 1463 (1986) ... 8
*Ortiz v. Deckers Outdoor Corp.*, 2026 U.S. Dist. LEXIS 100845 (N.D. Cal. May 6, 2026) 15, 21
*Ortiz v. Foris Dax, Inc.*, 2026 U.S. Dist. LEXIS 113330 (N.D. Cal. May 21, 2026) ... 11, 12, 25
*Pemberton v. Rest. Brands Int'l, Inc*., 2025 U.S. Dist. LEXIS 230964 (N.D. Cal. Nov. 24, 2025) ... 12, 23
*Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583 (2008) ... 25
*Popa v. Microsoft Corp*., 153 F.4th 784 (9th Cir. 2025) ... 6, 7, 8, 9
*Rabin v. Google LLC*, 725 F. Supp. 3d 1028 (N.D. Cal. 2024) ... 4
*Revitch v. New Moosejaw, LLC*, 2019 U.S. Dist. LEXIS 186955 (N.D. Cal. Oct. 23, 2019) 13, 17
*Ribas v. Clark*, 38 Cal. 3d 355 (1985) ... 6
*Rodriguez v. Google LLC*, 2024 U.S. Dist. LEXIS 1290 (N.D. Cal. Jan. 3, 2024) ... 23
*Ruiz v. Gap, Inc.*, 540 F. Supp. 2d 1121 (N.D. Cal. 2008) ... 13
*Sanders v. Am. Broad. Cos.*, 20 Cal. 4th 907 (1999) ... 6
*Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016) ... 20
*Shah v. Capital One Fin. Corp.*, 768 F. Supp. 3d 1033 (N.D. Cal. 2025) ... 24
*Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 (N.D. Cal. 2024) ... 19
*Shah v. MyFitnessPal, Inc.*, 824 F. Supp. 3d 906 (N.D. Cal. 2026) ... 4, 11, 18, 19
*Shah v. Politico LLC*, 2026 U.S. Dist. LEXIS 25740 (N.D. Cal. Feb. 6, 2026) ... 5, 21, 23
*Shah v. Talentbridge, Inc.*, 2026 WL 1507888 (C.D. Cal. May 28, 2026) ... 10
*Shahnaz Zarif v. Hwareh.com, Inc*., 789 F. Supp. 3d 880 (S.D. Cal. 2025) ... 17
*Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200 (1998) ... 6, 8, 9, 11
*Silver v. Stripe Inc.*, 2021 U.S. Dist. LEXIS 141090 (N.D. Cal. July 28, 2021) ... 12
*Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933 (N.D. Cal. 2024) ... 13, 17
*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ... 25
*Spears v. Campbell's Co*., 2026 U.S. Dist. LEXIS 202846 (N.D. Cal. Sep. 8, 2026) ... 9, 22
*St. Aubin v. Carbon Health Techs., Inc.*, 2024 U.S. Dist. LEXIS 179067 (N.D. Cal. Oct. 1, 2024) ... 14, 16, 18
*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ... 15
*Tavernetti v. Sup. Court of San Diego Cnty.*, 22 Cal. 3d 187 (1978) ... 13
*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ... 5, 7
*Turner v. Google LLC*, 737 F. Supp. 3d 869 (N.D. Cal. 2024) ... 4
*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989) ... 7
*United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015) ... 17
*United States v. Jones*, 565 U.S. 400 (2012) ... 12
*Walsh v. Dollar Tree Stores, Inc*., 2025 U.S. Dist. LEXIS 204652 (N.D. Cal. Oct. 16, 2025)9, 13, 19
*Wiley v. Universal Music Grp., Inc.*, 826 F. Supp. 3d 1121 (N.D. Cal. 2025) ... 4, 11, 19

**Statutes**

Cal. Civ. Code § 1709 ... 22
Cal. Civ. Code § 3333 ... 22
Cal. Penal Code § 631(a) ... 13

Cal. Penal Code § 638.50(b) ........ 18
Cal. Penal Code § 638.51 ........ 19
Cal. Penal Code § 638.51(a) ........ 18

**Other Authorities**

Restatement (Second) of Torts § 652B cmt. b. (Am. Law Inst. 1977) ........ 6

## I. INTRODUCTION

Defendant asks this Court to bless a simple but consequential deception: telling consumers they can opt out of tracking on its Website but, after they did so, continuing to permit Third Parties to track them anyway. Defendant's Motion recasts its deception as a mere "technical malfunction" and asks the Court to excuse it as "routine." MTD at 11-13, 21, 24. It is neither. Plaintiffs relied on that representation and made their privacy expectations clear, but Defendant nonetheless allowed Third Parties to track, collect, and transmit their browsing activity and device information and link it to a unique identifier over multiple sessions across multiple websites. That is not a "malfunction," but a feature, causing a precise harm that CIPA, the common law of privacy, and fraud statutes exist to redress.

Defendant's Motion largely re-argues positions this Court addressed in another case shortly after the consolidated complaint was filed. *See Barrales v. Reckitt Benckiser LLC*, 2026 U.S. Dist. LEXIS 171400 (N.D. Cal. July 31, 2026). There, the Court rejected similar arguments about CIPA. *Id.* at *26-31. Instead, Defendant cites *Barrales* only for the area in which the Court found plaintiffs in that case came up short: the detail pleaded about the named plaintiffs' own experiences with defendant's websites. MTD at 22-23 (citing *id.* at *12). But this Complaint supplies what *Barrales* was missing: Plaintiffs plead dated visits, identify specific searches and product pages, and even attach browser history. Defendant acknowledges these allegations, but deems them insufficient because Plaintiffs shopped for furniture rather than something more embarrassing. MTD at 23–24. But the analysis of standing for privacy-based claims does not only consider the *type* of information disclosed but also the manner of its disclosure. Put another way, what matters is whether Plaintiffs' information was disseminated and whether it was information that Plaintiffs reasonably believed was private. Plaintiffs allege both. For these reasons, and those set forth below, the Court should deny Defendant's Motion in its entirety.

## II. FACTUAL BACKGROUND

Defendant operates ashleyfurniture.com, an e-commerce storefront through which consumers browse and purchase furniture and home décor. CAC ¶¶ 1, 34. When users visit the Website it immediately displays a banner stating: "By using this site you agree to our use of

cookies and session replay tools to collect real-time information about your use of our site." *Id.* ¶ 38. Rather than "Accept All Cookies," users may "Configure" their preferences. *Id.* Doing so opens a Privacy Preference Center in which Defendant represents that users may "Manage Consent Preferences" to "Reject All" cookies—expressly including "Functional Cookies," "Quantum Metric Recordings," "Performance Cookies," and "Targeting Cookies"—leaving only the "Strictly Necessary Cookies" the site needs to function. *Id.* ¶ 39. Defendant's own Privacy Policy and Preference Center describe what the rejected cookies do, including building profiles and serving advertising. *Id.* ¶¶ 36–37.

The representations that a user could opt out of cookies was false. *Id.* ¶¶ 3, 40–48. Even before the banner appeared, and again after users clicked "Reject All," Defendant caused the Third Parties' cookies to be placed on users' devices and transmitted with user data, permitting the Third Parties to "track and collect data in real time regarding Website visitors' behaviors and communications," including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and geolocation data. *Id.* ¶¶ 5, 32, 151–52, 165–66, 179–80, 189–90. Because third-party cookies carry persistent identifiers, they permit the Third Parties "to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions," *id.* ¶ 31, and "to track users' behavior across the Internet and across time," enabling correlation with other data sets "to compile comprehensive user profiles," *id.* ¶ 48. The Third Parties then monetize those profiles for their own gain. *Id.* ¶¶ 6, 227.

To install these cookies, Defendant "voluntarily integrated 'third-party resources' from the Third Parties into the Website's programming" pursuant to "agreements between Defendant and those Third Parties." *Id.* ¶ 28. Because Defendant "controls the Website's software code," it has "complete control over whether first-party and third-party cookies are placed on California users' devices and/or intercepted by third parties." *Id.* ¶ 35. Defendant "and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms,

tag-management rules, and related implementation choices under Defendant's control." *Id.* ¶ 253. Vendor documentation for those platforms "explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies," and Defendant "received, reviewed, or had access to such implementation guidance." *Id.* ¶ 254. Defendant could "audit, test, configure, disable, or modify" those technologies and "had information available to it demonstrating that users' purported opt-out selections were not being honored." *Id.* ¶ 228. Defendant also used the Third Parties' "analytics, advertising, and reporting dashboards," through which it had "access to information reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections." *Id.* ¶ 255. Plaintiffs' counsel notified Defendant of this conduct on May 23, 2025; Defendant "did not disclose this conduct to users or modify its representations." *Id.* ¶ 20.

In January 2026, Luu visited the Website wanting a dining table and, after reading the banner and selecting "Reject All," "utilized the Website's search function to input searches for various tables" and "affirmatively clicked on specific product listings," including pages for a coffee table set and a dining table set. *Id.* ¶¶ 145, 153 (reproducing her browser history). Escobedo visited on November 9 and 10, 2025, viewing a product page for a table and then for a "Tavern set." *Id.* ¶¶ 159, 167 (reproducing her browser history). Tucker and Driscoll also visited "to obtain information about [Defendant's] products[.]" *Id.* ¶¶ 173, 183. All Plaintiffs allege they interacted with the Website after selecting "Reject All" in reliance on Defendant's promise that their activity would not be tracked. *Id.* ¶¶ 150, 152, 164, 166, 178, 180, 188, 190. All allege their data was taken and cookies were placed that allowed Third Parties to track them across the internet. CAC ¶¶ 6, 31–32, 151–152, 165–166, 179–180, 189–190. And none could have detected the conduct, which is visible only through developer tools Plaintiffs are untrained to use. *Id.* ¶¶ 19, 158, 172.

## III. ARGUMENT

### A. Plaintiffs' Claims Are Not Time-Barred.

Affirmative defenses do not provide a basis for dismissal under Rule 12(b)(6) unless the plaintiffs have pleaded themselves out of a claim by "admit[ting] all the ingredients of an

impenetrable defense," *Durnford v. MusclePharm Corp*., 907 F.3d 595, 604 n.8 (9th Cir. 2018), meaning that the plaintiffs' pleaded facts demonstrate no "potential factual dispute that could affect whether the defense applies," *Rabin v. Google LLC*, 725 F. Supp. 3d 1028, 1031 (N.D. Cal. 2024). Plaintiffs are "not required to plead around anticipated affirmative defenses, including the statute of limitations." *Turner v. Google LLC*, 737 F. Supp. 3d 869, 877 (N.D. Cal. 2024). However, Defendant claims that Plaintiffs Tucker and Driscoll, who allege visits "on one or more occasions during the last four years," are outside this period. MTD at 10–11, 18, 22. Not so.

Because Plaintiffs' four-year window necessarily "includes the past two years or one year, . . . it is entirely possible, from the face of the complaint, that [Plaintiffs Tucker and Driscoll's] claims are timely." *Wiley v. Universal Music Grp., Inc.*, 826 F. Supp. 3d 1121, 1131 (N.D. Cal. 2025) ("*UMG*"); *accord Shah v. MyFitnessPal, Inc*., 824 F. Supp. 3d 906, 912 (N.D. Cal. 2026) (rejecting the identical argument). Additionally, the delayed discovery rule postpones accrual until a plaintiff has reason to discover the claim. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005). Here, Plaintiffs explicitly plead delayed discovery alleging: they "could not reasonably have discovered this conduct at the time of their Website visits because it occurred through hidden, technical processes not visible to ordinary users"; "[n]othing about Plaintiffs' experience on the Website would have alerted a reasonable user that their selections were not being honored"; and they "did not discover Defendant's conduct until a later investigation revealed it." CAC ¶¶ 19, 158, 172. A cookie banner does not supply "actual notice" sufficient to defeat delayed discovery because "[r]egardless of whether plaintiffs were aware of a 'default' cookie enabling feature, they selected an option that seemingly allowed them to 'reject' that default." *Gabrielli v. Haleon US, Inc.*, 815 F. Supp. 3d 852, 871 (N.D. Cal. 2025). As result, Plaintiffs' claims could not accrue until shortly before the Complaint was filed. *See id.*; *Doe v. Fullstory, Inc.*, 712 F. Supp. 3d 1244, 1255 (N.D. Cal. 2024) (plaintiff's claim did not accrue until shortly before the complaint was filed, when she learned defendant's proprietary software was intercepting her information).

Additionally, Plaintiff Driscoll's claims are tolled by the arbitration Defendant's own Terms of Use compelled, because she was purportedly required to submit her dispute for AAA

arbitration, which she did on November 5, 2025. CAC ¶¶ 21–22. On November 20, 2025, the AAA declined to administer and closed the file because Defendant "failed to comply with the AAA policies regarding consumer claims and/or removed themselves from the Consumer Clause Registry." *Id.* ¶ 23. Plaintiff Driscoll then filed suit in federal court, specifically alleging tolling related to this arbitration. *Id.* ¶¶ 19–24. The Court should not allow Defendant to compel Plaintiffs into a forum, disqualify itself from that forum, and then invoke the resulting delay as a limitations defense. It should certainly not do so at the pleadings stage because "California's fact-intensive test for equitable tolling is more appropriately applied at the summary judgment or trial stage." *Shah v. Politico LLC*, 2026 U.S. Dist. LEXIS 25740, at *21 (N.D. Cal. Feb. 6, 2026). Consequently, nothing on the face of the Complaint bars Plaintiffs Tucker and Driscoll's claims and, to the extent that the Court requires greater specificity as to the timing of their Website visits, Plaintiffs request leave to amend so that they can supply it.

**B. <u>Plaintiffs Have Standing.</u>**

Defendant told Plaintiffs they could "Reject All" cookies. Plaintiffs rejected them. Defendant nonetheless caused Meta, Google, Microsoft, TikTok, LiveRamp, Pinterest, and other Third Parties to place cookies that allowed the Third Parties to capture Plaintiffs' data and communications in real time where it was then joined to persistent cross-site identifiers and monetized. CAC ¶¶ 4–6, 99–101, 145–192. That is a concrete injury. The harm is the loss of control over information—a harm the common law has recognized for decades.

**1. Loss of Control Over One's Own Information Is an Injury in Fact**

In *TransUnion LLC v. Ramirez*, the Supreme Court confirmed that "[v]arious intangible harms can also be concrete," and "[c]hief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." 594 U.S. 413, 424–25 (2021). The Court named "disclosure of private information" and "intrusion upon seclusion" as paradigm examples. *Id.* at 425. A plaintiff need not identify an exact common-law twin; the asserted harm need only bear a "close relationship" to one long recognized as actionable. *Id.* at 424. Indeed, the Ninth Circuit has declined to employ an element-by-element test and instead requires courts to "assess whether an individual plaintiff has suffered a harm that has

traditionally been actionable in our nation's legal system." *Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025).

The intrusion tort supplies that relationship here because it focuses entirely on interference with the plaintiff's private affairs. The California Supreme Court explained why secret electronic capture is its own distinct injury as follows:

> [W]hile one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or a mechanical device. . . . [S]uch secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 234–35 (1998) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 360–61 (1985)); *accord Sanders v. Am. Broad. Cos.*, 20 Cal. 4th 907, 915 (1999). The right invaded is the right to control one's own information; the violation is complete at the moment of unconsented capture, and nothing turns on whether the content was independently scandalous. *See* Restatement (Second) of Torts § 652B cmt. b. (Am. Law Inst. 1977) (recognizing the tort of intrusion upon seclusion, for which the "intrusion itself" makes the defendant liable). Rather, there is a "legal recognition of the individual's reasonable expectation of privacy against unauthorized interception and recording of confidential conversations," and that "confidential communications" are made in "circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." *Shulman*, 18 Cal. 4th at 234. A mundane conversation secretly relayed to an uninvited auditor is actionable under *Ribas* and *Shulman* just as surely as an intimate one.

The Ninth Circuit recognizes the same control-based injury, explaining that "[v]iolations of the right to privacy have long been actionable at common law" and that the right "encompass[es] the individual's control of information concerning his or her person." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (quoting *U.S. Dep't of Justice v.*

*Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989)). That formulation is the Supreme Court's own, articulated decades before *TransUnion*, evincing the very common-law tradition *TransUnion* directs courts to consult. *In re Facebook* similarly held that plaintiffs "adequately alleged that Facebook's tracking and collection practices would cause harm or a material risk of harm to their interest in controlling their personal information" after Facebook "gained a cradle-to-grave profile" of their browsing "without users' consent." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598–99 (9th Cir. 2020) ("*In re Facebook*").

*Popa v. Microsoft Corp.* explicitly endorsed these holdings post *TransUnion*. 153 F.4th at 784 ("we need not revisit *Eichenberger* and *In re Facebook* in reaching our decision today."). A three-judge panel cannot overrule a prior panel absent an intervening decision from a "higher authority" that is "clearly irreconcilable" with it. *Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003) (en banc). *Popa* did not invoke that exception; it held only that the pre-*TransUnion* holdings—that "a plaintiff *necessarily* enjoys Article III standing when suing under a statute that protects a substantive right to privacy"—did not survive. *Popa*, 153 F.4th at 792. But, the *Popa* Court observed, "[d]espite the broad statements made therein, those decisions still accounted for the individual circumstances giving rise to the plaintiffs' alleged injuries rather than simply greenlighting a per se rule for privacy statutes." *Id.* at 792–93. *Popa* narrowed the rule a plaintiff might extract from those cases by fashioning the "standing inquiry *particularized* to a plaintiff's circumstances." *Id.* at 791 (emphasis added). It did not disturb what they held on their facts.

**2. Plaintiffs' Alleged Injuries Satisfy *Popa*.**

Where a plaintiff invokes a traditional analogue, the court must "look to the specific underlying harm experienced by the plaintiff and compare it, in detail, to a specific common-law tort." *Id.* While it is true that *Popa* failed to show defendant "caused her to experience any kind of harm that is remotely similar to the highly offensive interferences or disclosures that were actionable at common law," the court clarified that "an 'exact duplicate' is not required, and many courts require a match only in the kind of harm and not the degree." *Id.* But "*Popa* never purported to have expressly 'reject[ed]' the tracking technology at issue." *Haleon*, 815 F. Supp. at 867. So, to determine if "the kind of harm" implicated Popa's privacy, the court's analysis

pivoted to find that the plaintiff did not have standing because she "identifies no embarrassing, invasive, or *otherwise private* information collected by [Defendant.]" *Popa*, 153 F.4th at 791 (emphasis added). Neither *Popa* nor *TransUnion* (which never considered offensiveness) requires the Court to find that Plaintiffs' information is independently embarrassing or invasive where, as here, it is "otherwise private" due to Plaintiffs' express privacy preferences and Defendant's explicit privacy guarantees.

The Complaint's plaintiff-specific facts allege that Defendant disclosed their "otherwise private" information. *See supra* § II. Here, the cookies Defendant caused to be placed carry persistent identifiers transmitted to more than a dozen Third Parties, which use them to track users "across websites . . . and across multiple browsing sessions" and to aggregate and monetize the resulting profiles for their own gain. CAC ¶¶ 5–6, 31, 99–101. Defendant's conduct is akin to the unannounced second auditor discussed in *Ribas* and *Shulman*—a mechanical listener inserted into an exchange the user reasonably believed was confined to herself and the site she chose to visit, capturing her interactions and communications in real time. Under *Eichenberger* and *In re Facebook*—which *Popa* confirmed—and the common-law tradition *TransUnion* directs this Court to consult, Plaintiffs' loss of control over their searches, browsing, and interactions on the Website and beyond is a concrete injury in fact.

Assuming, *arguendo*, that offensiveness is required to assess standing here, the inquiry is multi-factor and Plaintiffs satisfy it. *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009), on which Defendant relies for the "high bar," MTD at 14, directs courts to weigh the "degree and setting" of the intrusion and the intruder's motives. *See also Shulman*, 18 Cal. 4th at 236 (quoting *Miller v. Nat'l Broad. Co.*, 187 Cal. App. 3d 1463, 1483–84 (1986)). Content sensitivity is one consideration, alongside the manner, method, and scope of the intrusion and the purpose behind it. *See, e.g.*, *Barrales*, 2026 U.S. Dist. LEXIS 171400, at *11 ("a concrete injury may be established by allegations that a website operator tracked a user's digital activity after the user expressly rejected cookies, *particularly if* the website relates to sensitive topics.") (emphasis added).

Nor is deception irrelevant merely because a broken promise is not itself an injury. Defendant's representation matters for three reasons that bear directly on the *Hillsides* and *Shulman* factors: it defeats consent (as relevant in *In re Facebook*), it establishes that Plaintiffs reasonably expected their activity to remain between themselves and Defendant (as relevant in *Shulman*), and it speaks to Defendant's motives and objectives in deploying tracking technology behind a "Reject All" button that did not work. Courts in this District treat deceit as precisely such a "plus" factor. *See In re Google Location Hist. Litig.*, 514 F. Supp. 3d 1147, 1157 (N.D. Cal. 2021). The injury is the highly offensive capture and transmission that followed regardless of the sensitivity of the data and communications. *See, e.g.*, *Haleon*, 815 F. Supp. 3d at 865; *Spears v. Campbell's Co*., 2026 U.S. Dist. LEXIS 202846, at *27 (N.D. Cal. Sep. 8, 2026); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *27 (N.D. Cal. July 14, 2025) ("*Motorola*"); *Walsh v. Dollar Tree Stores, Inc*., 2025 U.S. Dist. LEXIS 204652, at *31 (N.D. Cal. Oct. 16, 2025) ("*Dollar Tree*") (finding standing where underlying data did not involve health or financial data).

Defendant relies on *Popa's* analogy, likening the plaintiff's allegations to "a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales." MTD at 11 (quoting 153 F.4th at 791). That comparison was available because of *how* the data there was gathered: first-party session-replay analytics, used by the operator of the site the plaintiff chose to visit, with no allegation that she had ever asked it to stop. Here, "in Plaintiffs' case, it is like a store clerk telling shoppers they would not be tracked by anyone, then secretly placing tracking devices on shoppers so that third parties could follow the shoppers around outside the store for periods of time (up to a year or more) to collect information about the shoppers. This is not the same as in *Popa*." *Spears*, 2026 U.S. Dist. LEXIS 202846, at *28–29. Thus, while *Popa* is distinguishable on its facts, its application dictates that Plaintiffs here have suffered an injury in fact sufficient to confer standing.

**3. Defendant's Arguments Fail on the Pleadings.**

Defendant's argument reduces to one principal proposition: a plaintiff "must identify the specific personal information [she] disclosed that implicates a protectable privacy interest," and

that a dining table does not qualify. MTD at 11–13. As explained above, that is not required, and Plaintiffs' allegations are a world apart from those this Court found wanting in *Barrales*, where the complaint was "light on details regarding the named Plaintiffs' specific experiences," was framed around "the experience of a composite consumer," and said only that plaintiffs "visited certain websites operated by Defendant, selected the option to 'Disable All' cookies, and browsed on the websites." 2026 U.S. Dist. LEXIS 171400, at *11. Plaintiffs here plead the date, the search, the specific pages, the browser record, and the specific signaling information that was routed offsite. CAC ¶¶ 145, 153–156, 159, 167–170, 173, 183.

Defendant also argues that even Plaintiff Luu's searches are unprotected because she does not allege she entered information linking them to her identity, and that device information cannot bridge the gap. MTD at 13 (citing *Shah v. Talentbridge, Inc.*, 2026 WL 1507888, at *3 & n.7 (C.D. Cal. May 28, 2026)). Even if such identity linking were required to establish an injury—it is not—the Complaint alleges that Defendant transmitted Plaintiffs' data to LiveRamp, an identity-resolution company whose stated business is performing exactly the link Defendant says cannot be inferred. CAC ¶¶ 99–101. LiveRamp's own Privacy Notice explains that it uses the data received from partner websites to "create an online identification code for the purpose of recognizing your device," which "can link your browsing activity across different websites and other applications and services to your specific device associated with the email address, *identifying the user behind the device*." *Id.* ¶ 101 (emphasis added). On a Rule 12 motion, the allegation that Plaintiffs have alleged that their browsing was delivered to a firm that exists to attach it to them by name, must be taken as true.

### C. Plaintiffs Sufficiently Allege Privacy Claims.

Plaintiffs' invasion of privacy and intrusion upon seclusion claims share the same elements; both require Plaintiffs to allege: (1) they had a reasonable expectation of privacy, and (2) the intrusion was highly offensive. *In re Facebook*, 956 F.3d at 601. Plaintiffs allege both.

#### 1. Plaintiffs Had a Reasonable Expectation of Privacy.

As discussed *supra* III.B, Defendant created the reasonable expectation it now disclaims by telling Plaintiffs they could "Reject All" cookies. CAC ¶¶ 36–39. "Because [defendant] told

users that they could opt out of such forms of information collection, users of [defendant's] website had a reasonable expectation of privacy with respect to that information." *UMG*, 826 F. Supp. 3d at 1132; *accord MyFitnessPal*, 824 F. Supp. 3d at 915. California custom reinforces that expectation. Because the CCPA requires businesses to offer an opt out from collection for cross-context behavioral advertising, "California users are presumably accustomed to seeing these cookie rejection popups online and understand the pop-up to be an effective means to reject cookies," and that expectation "would be reasonable, since a failure to honor a user's opt[-]out request would violate the CCPA and place the website at risk of civil penalties." *Ortiz v. Foris Dax, Inc.*, 2026 U.S. Dist. LEXIS 113330, at *9 (N.D. Cal. May 21, 2026); *see UMG*, 826 F. Supp. 3d at 1133 (pre-CCPA authorities are "of limited value in considering users' reasonable post-enactment expectations"). It is enough that Plaintiffs alleged that they understood the pop-up to mean they could browse the Website untracked.

Although Defendant argues that it cannot "intrude" on communications directed to its own Website, this misconstrues the Complaint's allegations. MTD at 23-24. Plaintiffs do not allege that Defendant eavesdropped on its own Website, but that it caused Third Parties to do so after explicitly promising otherwise. Plaintiffs specifically allege that Defendant placed third-party code on its Website that caused users' communications to be intercepted by and routed to those Third Parties—which are "separate and distinct entities from the parties to the conversations"—who then used Plaintiffs' and users' information "for their own business purposes." CAC ¶¶ 49, 227. The zone invaded is Plaintiffs' devices and their activity across the Internet, not Defendant's inbox. *Id.* ¶¶ 31, 48, 234 (cookies and code "resided on Plaintiffs' California-located device").

**2. Defendant's Intrusion Was Highly Offensive.**

Defendant's intrusion was also highly offensive because the inquiry is holistic, weighing "the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *In re Facebook*, 956 F.3d at 606. Unlike the expectation of privacy, which must be "objectively reasonable," "California tort law provides no bright line on ['offensiveness']; each case must be taken on its facts." *Hernandez*, 47 Cal. 4th at 287 (quoting *Shulman*, 18 Cal. 4th at 232, 237). "Under

California law, courts must be reluctant to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is." *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 797 (N.D. Cal. 2019). *See also Motorola*, 2025 U.S. Dist. LEXIS 133836, at *26.

Here, a holistic view of Defendant's conduct satisfies the inquiry. Plaintiffs allege that, despite their express rejection of cookies, Defendant enabled them, which allowed persistent cross-site profiling that it and the Third Parties monetize. CAC ¶¶ 6, 48, 139–44. Courts recognize that the sheer volume and persistence of data accumulation independently renders an intrusion highly offensive, "regardless of the specific type and quality" of any single data point. *See*, *e.g.*, *United States v. Jones*, 565 U.S. 400, 418 (2012) (Sotomayor, J., concurring) ("I for one doubt that people would accept without complaint the warrantless disclosure []of a list of every Web site they had visited in the last week, or month, or year."); *Silver v. Stripe Inc.*, 2021 U.S. Dist. LEXIS 141090, at *17–18 (N.D. Cal. July 28, 2021) ("volume of the collected information is also important" in determining whether "the intrusion was highly offensive"). Deceit is also a recognized "plus factor" in conducting the offensiveness analysis. *In re Google Location Hist. Litig.*, 514 F. Supp. 3d at 1157. Courts have found that combination sufficient. *See, e.g.*, *Pemberton v. Rest. Brands Int'l, Inc*., 2025 U.S. Dist. LEXIS 230964, at *16 (N.D. Cal. Nov. 24, 2025) ("*Rest. Brands Int'l*") (promise that users could opt out, followed by cookie storage and transmission despite the opt out, "would be highly offensive"); *Foris Dax*, 2026 U.S. Dist. LEXIS 113330, at *4 (citing *D'Antonio v. Smith & Wesson Inc.* as "finding that violation of specific promise to users that they could disable cookies was deceit that elevated conduct to be highly offensive"); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 942 (N.D. Cal. 2023) (accumulation of online data despite representations to the contrary supported an invasion of privacy claim). Here, Plaintiffs allege deceit plus scale plus commercial motive, which courts consistently hold is the sort of deception-plus-tracking that comprises a highly offensive intrusion, or at least raises a question that cannot be resolved on the pleadings. *See In re Google Location Hist. Litig.*, 514 F. Supp. 3d at 1157-58 (continued collection of data after a user disabled a tracking setting was highly offensive); *Revitch v. New Moosejaw, LLC*, 2019 U.S. Dist. LEXIS

186955, at *9 (N.D. Cal. Oct. 23, 2019) ("A jury could conclude" that intrusion into a plaintiff's browsing habits is a highly offensive breach of social norms).

Defendant's assertion that the disclosure of "generic web browsing data" cannot be highly offensive focuses on the category of information at issue, but ignores the totality of the circumstances, including Defendant's motive and the manner of the intrusion. MTD at 24. Tellingly, the cases Defendant cites for the proposition that routine data disclosure is never highly offensive did not involve allegations that the defendant expressly promised users the ability to prevent the very collection at issue and then failed to honor that promise. *See id.* (citing *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012); *Ruiz v. Gap, Inc.*, 540 F. Supp. 2d 1121, 1128 (N.D. Cal. 2008); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012); *Jones v. Peloton Interactive, Inc.*, 720 F. Supp. 3d 940, 950-51 (S.D. Cal. 2024)). That is why courts decline to follow them. *See, e.g.*, *D'Antonio v. Smith & Wesson Inc*., 820 F. Supp. 3d 928, 935 (N.D. Cal. 2026) ("*Smith & Wesson*") (reliance on "cases like . . . *Hammerling* . . . is misplaced" because they did not "involve[] a specific promise that users would not be tracked in specific ways").

Section 631(a) imposes liability on anyone who (1) intentionally taps or makes an unauthorized connection with a wire, line, or cable; (2) willfully reads or attempts to read the "contents or meaning" of a communication in transit without the consent of all parties; (3) uses or communicates information obtained through the foregoing; or (4) "aid[s], agree[s] with, employ[s], or conspire[s] with any person" to do or permit any of the foregoing acts. Cal. Penal Code § 631(a); *Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933, 939–40 (N.D. Cal. 2024); *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 831 (N.D. Cal. 2021). Preliminarily, intercepting communications while in transit qualifies as a violation of CIPA, but "divulging the contents of an intercepted communication is an independent act that further intrudes on the privacy of the parties to the communication," and is also "illegal under section 631, subdivision (a)." *Tavernetti v. Sup. Court of San Diego Cnty.*, 22 Cal. 3d 187, 193 (1978). "This is the rule regardless of the original legality of the interception." *Id.* Plaintiffs have alleged that Defendants did both. *See Dollar Tree*, 2025 U.S. Dist. LEXIS 204652, at *45 (concluding similar in transit allegations "are

not mere 'labels and conclusions' but are well-pleaded factual allegations.").

Plaintiffs allege that Defendant aided and abetted Third Party violations of clauses 2 and 3. Specifically, Plaintiffs allege that the third-party cookies and corresponding software code is the method by which Defendant cause Third Parties to intercept the content of communications "in real time[,]" "while those communications are in transit" without Plaintiffs' consent. *Id.* ¶¶ 5, 32, 44, 121–125, 134, 138. Plaintiffs support their claims with descriptions of how this process "necessarily requires contemporaneous access to the content of communications while they are in transit" and diagrams of the HTTP network traffic flow to demonstrate how and when the transmission occurred. *Id.* ¶¶ 53, 91 (search strings); 122–132 (Meta data ingestion system).

**1. The Website Intercepted the Content of User Communications.**

"Contents" means "the intended message conveyed by the communication," as distinguished from "record information regarding the characteristics of the message." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). Search terms and detailed URLs identifying the specific product or page a user viewed qualify as contents. *Id.* at 1108–09; *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 859 (C.D. Cal. 2024); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 936 (N.D. Cal. 2023); *St. Aubin v. Carbon Health Techs., Inc.*, 2024 U.S. Dist. LEXIS 179067, at *12 (N.D. Cal. Oct. 1, 2024); *Goldstein v. Rumble Inc.*, 2026 U.S. Dist. LEXIS 113489, at *11 (C.D. Cal. Apr. 24, 2026) ("detailed URLs that reveal the specific document, product, or service that a user is viewing count as contents of communications"). Here, Plaintiffs alleged that Defendant's Website allowed Third Parties to intercept the contents of their communications.

For example, both Luu and Escobedo allege their specific search terms. *See supra* § II. All Plaintiffs allege browsing and describe how the cookies function, distinguishing those that capture contents from those capturing only record information. CAC ¶¶ 50–54 (alleging capture of contents such as search bar content and other user input data); 57-58, 73 (showing interception of page title); 82-84 (alleging specific Third-Party cookies intercept keystrokes, scrolling and clicks); 89 (showing interception of search inquiry for "privacy"); 121-130 (describing processing of contents); 131–38 (distinguishing capture of record information). These allegations "support

a plausible inference that they in fact provided input to the websites," even without an explicit allegation of typed input—a rule that covers Tucker and Driscoll, who allege they browsed the Website after clicking "Reject All" while Defendant's code transmitted their communications. *Ortiz v. Deckers Outdoor Corp.*, 2026 U.S. Dist. LEXIS 100845, at *6 (N.D. Cal. May 6, 2026); CAC ¶¶ 180, 190.

Although Defendant concedes that Plaintiff Luu has satisfied the "content" requirement, it contends that Plaintiffs Escobedo, Tucker, and Driscoll have not. MTD at 26–27. First, Defendant claims that Plaintiff Escobedo only alleged the interception of "automatically-generated data about her browsing activity—not any information she intentionally communicated to the Website." *Id.* at 27. However, as set forth above, Plaintiff Escobedo alleged what products she viewed, and a URL identifying the specific product a user chose to view is itself content. *See*, *e.g.*, CAC ¶ 167 (viewed specific products), 107 (specific product information is intercepted by Third Parties); *see also Goldstein*, 2026 U.S. Dist. LEXIS 113489, at *11 (URL containing descriptive title is contents under CIPA). Second, Defendant argues that Plaintiffs Tucker and Driscoll provided no specific allegations as to their search histories or browsing activity. "[T]here is no requirement that [plaintiffs] specifically allege the exact contents of her communications"; they "merely need[] to show that the contents were not record information such as [] name and address[.]" *Byars v. Tire*, 654 F. Supp. 3d 1020, 1027 (C.D. Cal. 2023). Plaintiffs Tucker and Driscoll allege they visited the Website "seeking information about Defendant's products," and "browse[d] the Website" after rejecting cookies. In conjunction with the allegations outlining the information that is intercepted by Third Parties for all users, including Plaintiffs, this is sufficient to "plausibly suggest an entitlement to relief." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). As set forth above, all Plaintiffs allege that the Website collected both record and contents information and distinguish between the two. If the Court finds this insufficient as to each individual plaintiff, Plaintiffs request leave to amend.

**2. The Website Intercepted Users' Communications While In Transit.**

"[A]llegations that [communications] are intercepted in real time through the use of computer code provide[] sufficient factual detail to support the 'in transit' requirement at the

pleadings phase." *Esparza v. UAG Escondido A1 Inc.*, 2024 U.S. Dist. LEXIS 24429, at *3 (S.D. Cal. Feb. 12, 2024); *accord St. Aubin*, 2024 U.S. Dist. LEXIS 179067, at *15. Plaintiffs plead real time interception, alleging that Third Parties "operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage," and identify the specific platforms—Apache Flink, Kafka, and Amazon Kinesis—engineered to operate on data "in flight," i.e., after it leaves a user's browser but before it reaches the Third Parties' storage. CAC ¶¶ 121–27.

Defendant argues Plaintiffs have not alleged an interception "while in transit" but relies solely on authorities involving complaints silent as to when transmission occurred. MTD at 27. In *Lewis v. Magnite, Inc.*, the complaint offered "little regarding Defendant's analysis of Plaintiffs' communications—rather, Plaintiffs' allegations *suggest* that Defendant would analyze Plaintiffs' communications after it collects them, not as it collects them." 2025 WL 3687546, at *11-12 (C.D. Cal. Dec. 4, 2025) (emphasis added). In *J.S. v. Spring Fertility Holdings, LLC*, plaintiffs merely alleged that defendant sent data to third parties "when a user who has signed in . . . is browsing the website' and begins 'tracking their activity the moment they entered [the websites][.]'" 2026 U.S. Dist. LEXIS 117312, at *14 (N.D. Cal. May 27, 2026). Here, by contrast, Plaintiffs plead the specific mechanisms by which their data is captured in real time, including both technical detail and references to the Third Parties' own explanation of specific real-time data-ingestion architecture they use. CAC ¶¶ 121–34. This is sufficient, and requiring more would "require the CIPA plaintiff to engage in a one-sided guessing game because the relevant information about data capture typically resides uniquely in the custody and control of the CIPA defendant and its third-party recorder." *Esparza*, 2024 U.S. Dist. LEXIS 24429, at *4.

**4. Defendant Aided and Abetted a Violation of Section 631(a).**

"The analysis for a violation of CIPA is the same as that under the federal Wiretap Act." *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) (quotation omitted). The Ninth Circuit rejected "that the word 'intentionally' in the Wiretap Act 'must be read to require a defendant to know that [its] conduct is unlawful' . . . Rather, the statute only requires 'an

intentional act, defined as an act that is being done on purpose.'" *Shahnaz Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 894 (S.D. Cal. 2025) (quoting *United States v. Christensen*, 828 F.3d 763, 774 (9th Cir. 2015)). Courts in this Circuit regularly hold that intent under CIPA is satisfied by pleading that a defendant intentionally "enable[d] a third party's eavesdropping on or interception of the communication." *See, e.g.*, *Gabrielli*, 2025 U.S. Dist. LEXIS 133836, at *29; *Doe v. Amgen, Inc.*, 2024 U.S. Dist. LEXIS 144579, at *5 (C.D. Cal. Aug. 13, 2024); *Revitch*, 2019 U.S. Dist. LEXIS 186955, at *4 ("[T]he complaint adequately alleges that [Defendant] violated section 631 by enabling [a third party's] wrongdoing"); *Kotlarsz v. Integrity Vehicle Servs., Inc.*, 2024 U.S. Dist. LEXIS 213565, at *22 (C.D. Cal. Sep. 3, 2024) ("it was the [D]efendant's website on which the [third party] operated.").

As previously discussed *supra* § II, Plaintiffs plead Defendant's knowledge and intent in detail, including that it entered agreements with Third Parties to integrate Third Party code into the Website, managed the data transmitted before and after a user disabled third party cookies, and had access to tools and information which allowed it to know whether users' consent preferences were honored. This is more than enough under CIPA, which does not require Plaintiffs to *prove* intent at the pleadings stage. *See James v. Walt Disney Co*., 701 F. Supp. 3d 942, 953–54 (N.D. Cal. 2023) (intent plausibly alleged because "it can be reasonably inferred that Disney entered into contractual agreement with [third party] under which [the third party] would collect information. . . so that Disney could market to and attract new customers.").

Contrary to Defendant's contention, it need not act "'in order to have the third party perform acts that violate the statute.'" MTD at 26 (quoting *Yeti Coolers*, 754 F. Supp. 3d at 942). This misconstrues *Yeti*, where the court found that the defendant only intended to enable the third party to process payments made on its Website, acknowledged that CIPA "does not necessarily incorporate the common law [intent] requirement for aiding and abetting . . . [but] other language in [CIPA's] fourth clause does require some level of knowledge and intent." *Id.* at 943. As explained above, Plaintiffs allege more than "some" level of intent and knowledge. *Supra* § II. Likewise, Plaintiffs need not allege "actual knowledge" to sustain their aiding and abetting claims under section 631. MTD at 28. The plain text of CIPA "does not include an intent standard" and

Defendant cannot credibly claim that it did not intend to cause the Third Parties to wiretap and eavesdrop on users' Personal Communications when it integrated the third-party code into their Website to do exactly that. *St. Aubin*, 2024 U.S. Dist. LEXIS 179067, at *20. Indeed, this Court recently found that almost identical allegations sufficed. *Barrales*, 2026 U.S. Dist. LEXIS 171400, at *32.

**D. <u>Plaintiffs State a Claim Under Section 638.51 of CIPA.</u>**

CIPA Section 638.51(a) prohibits any person from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order." The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b). The statutory definition contains no telephone limitation, "even though other sections of CIPA are expressly so limited." *MyFitnessPal, Inc.*, 824 F. Supp. 3d at 919. It is "specific as to the type of data [collected]," but "vague and inclusive as to the form of the collection tool." *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

Here, Plaintiffs adequately plead each element of their Section 638.51 claims by alleging that: (1) the cookies and the corresponding software code Defendants installed on its Website operate as pen registers because (2) they record information about the communications such as users' IP address and user-agent information, which is (3) "routing, addressing, or signaling information." *See, e.g.*, CAC ¶¶ 156, 170, 241–242. Specifically, the Complaint alleges the capture of TCP and UDP port numbers functioning as "sub-addresses that direct traffic to specific software processes"; TCP connection and TLS handshake metadata used to "initiate, coordinate, and manage electronic communications"; HTTP request-header metadata such as the "Host" header, which "function[s] as digital 'dialing' information"; and network- and transport-level routing metadata including source and destination IP addresses, ports, protocol, and connection timestamps. *Id.* ¶¶ 135–38. That metadata "constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register." *Id.* ¶ 136. Defendant caused this code to be

placed on Plaintiffs' devices, where it "established and maintained network connections between the users' devices and the Third Parties," without a court order or consent. *Id.* ¶¶ 243, 245–46. That suffices. *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 929 (N.D. Cal. 2024) ("All that is required is that the Trackers record addressing information transmitted by the user's computer or smartphone in connection with the outgoing HTTP request.").

Plaintiffs also allege that "[s]ome of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website." CAC ¶ 244. The Complaint pleads separate technologies for separate purposes: some capture contents (supporting the fraud and Section 631 claims), while others capture only routing, addressing, and signaling information (supporting the pen register claim). *Id.* ¶¶ 50–120, 135–38, 242–44. Numerous courts have accepted similar allegations that the cookies operate independently from each other and collect different information. *See*, *e.g.*, *In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147, 1155 (N.D. Cal. 2025) ("If the various functionalities within the Meta Pixel operate independently from one another, as plaintiffs plausibly allege, the process that records metadata in a pen register-like manner is a separate 'device' or 'process' from the one that collects the contents of users' communications."); *MyFitnessPal*, 824 F. Supp. 3d at 920 (applying *In re Meta Pixel*); *UMG*, 826 F. Supp. 3d 1121, 1138 (same); *Haleon*, 815 F. Supp. 3d at 872 (same); *Dollar Tree*, 2025 U.S. Dist. LEXIS 204652, at *50 ("Some of these data may be contents, while others may not be. Plaintiffs are permitted to plead both causes of action and rely on different cookies—transmitting different data—to support each cause of action."); *De Ayora v. Inspire Brands, Inc.*, 2026 U.S. Dist. LEXIS 126682, at *17 (N.D. Cal. June 8, 2026) (plaintiffs sufficiently alleged "dialing, routing, addressing, or signaling information" where "Plaintiffs allege that their IP addresses were tracked").

Defendant argues that Section 638.51 is limited to telephone-style surveillance and that its 2015 enactment history and statutory interpretation confirm as much. MTD at 29–32. But as this Court recently noted, "the Ninth Circuit has stated expressly that '[t]hough written in terms of wiretapping, Section 631(a) applies to Internet communications.'" *Barrales*, 2026 U.S. Dist.

LEXIS 171400, at *28 (internal citations omitted). Defendant also argues that Plaintiffs' allegations elsewhere, that some technologies captured "contents," defeats the pen register claim. MTD at 32. This Court also recently noted that others in this District have allowed similar claims to proceed past the pleadings stage, rejecting Defendant's broader premise that a family of technologies that records both categories of data escapes the statute altogether. *Id.* at 16–17 (citing *In re Meta Pixel*, 793 F. Supp. 3d 1147; *In re Meta Android Priv. Litig.*, 2026 WL 1279416, at *8) (N.D. Cal. May 11, 2026)). In sum, Defendant's arguments are "inappropriate to determine as a matter of law at the pleadings stage" and Defendant's motion should be denied. *Id.* at 17.

**E. <u>Plaintiffs' Fraud Claims Satisfy Rule 9(b).</u>**

Defendant argues that Plaintiffs did not meet Rule 9(b) because they failed to allege knowledge, intent, and injury. MTD at 16-20. In so doing, Defendant mischaracterizes Rule 9(b) as requiring Plaintiffs to plead intent with "particularity." *Id.* at 16–17. But Rule 9(b) explicitly states that "intent, knowledge, and other conditions of a person's mind may be alleged generally" and the Ninth Circuit clarified that the "heightened pleading standard" only applies to the circumstances of the fraud, not the defendant's state of mind. *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1031–32 (9th Cir. 2016) (citing *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). Rule 9(b) permits pleading knowledge and intent on "information and belief" where, as here, the relevant facts lie within the defendant's exclusive control. *Blake v. Dierdorff*, 856 F.2d 1365, 1369 (9th Cir. 1988). Plaintiffs satisfied these pleading standards.

**1. Plaintiffs Sufficiently Alleged Knowledge and Intent.**

To satisfy the requirement of scienter, California law requires "either that defendant had actual knowledge of the untruth of his statements, or that he lacked an honest belief in their truth, or that the statements were carelessly and recklessly made, in a manner not warranted by the information available to defendant." *Harper v. Silver*, 200 Cal. App. 2d 103, 108 (1962). Plaintiffs allege that "[b]y implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices." CAC ¶ 226. Defendant had the ability to audit its banner and was obligated to do so. *Id.* ¶ 228 (Defendant "must affirmatively configure consent settings and tag behavior to

prevent tracking technologies from firing after users reject cookies."); *id.* ¶ 230 (Defendant had an obligation to ensure the banner operated correctly based on industry standards and privacy regulations). Based on its ability to audit the operation of the banner and review and use the intercepted data for its benefit, "Defendant had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations." *Id.* ¶ 228. Thus, Defendant either had actual knowledge that the representations in the cookie banner were false, or that the statements were "carelessly and recklessly made, in a manner not warranted by the information available to defendant." *Harper*, 200 Cal. App. 2d at 108; *see also Doe v. Xytex Corp.*, 2017 U.S. Dist. LEXIS 43623, at *14–15 (N.D. Cal. Mar. 24, 2017) (allegations that defendant had access to information revealing the falsity of its representations sufficient to allege scienter).

Plaintiffs allege Defendant knowingly programmed and operated its Website to allow third-party cookies and tracking. *See supra* § II. Plaintiffs also allege that Defendant "intended to induce Plaintiffs and Class members to alter their positions to their detriment" by inducing them to use the Website "under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject non-strictly necessary cookies." *Id.* ¶ 263. They also allege Defendant's motive: profit from users' data. *Id.* ¶¶ 139–44, 258. Multiple courts have found such allegations more than adequate. *Haleon*, 815 F. Supp. 3d at 873 ("because intent may be alleged generally, see Fed. R. Civ. P. 9(b), his allegations are sufficient for now"); *Politico*, 2026 U.S. Dist. LEXIS 25740, *19 ("The purpose of Rule 9(b) is to give defendants notice of the specific fraudulent conduct against which they must defend.").

Defendant's knowledge argument leans heavily on *Deckers*, which it claims "reflects the unremarkable principle that website operators often lack technical expertise regarding how third-party tracking technologies and consent management tools function." MTD at 18. *Deckers* is distinguishable because it asked the court to infer knowledge of how third-party resources worked without outlining the specific mechanisms by which defendant was alleged to have known cookies were enabled post-opt-out. 2026 U.S. Dist. LEXIS 100845, at *4–*5. Here, no inference

is required; Plaintiffs describe how Defendant has direct access to tools and information about the cookies' ongoing operation. *See supra* § II. *Deckers* is also incompatible with the notion that Plaintiffs must plead knowledge with greater specificity. If Defendant itself lacks the technical expertise to ensure its Website is functioning as advertised, the Court can hardly require Plaintiffs, who do not have full access to Defendant's Website information and have specifically pled a lack of technical expertise, to do so at the pleadings stage. The Court must draw inferences in Plaintiffs' favor, and Defendant's "obvious alternative explanation" argument, MTD at 18–19, is "an inherently factual contention that cannot properly be resolved on a motion to dismiss." *Motorola*, 2025 U.S. Dist. LEXIS 133836, at *24.

Defendant's intent argument rests entirely on its knowledge argument and *In re Google Assistant Priv. Litig.*, 546 F. Supp. 3d 945, 970 (N.D. Cal. 2021). MTD at 19. But *In re Google's* plaintiffs acknowledged only that Google "knew that they could and would change the circumstances under which . . . the devices could record and transmit" plaintiffs information case and the Court found that Google's promise that its devices had "adequate security measures" was "vague to the point of meaninglessness[.]" 546 F. Supp. 3d at 969. Here, both Defendant's false promise and Plaintiffs' allegations about its knowledge are specific. *See supra* III.D.3. Defendant's argument also fails for the independent reason that intent "may be alleged generally" under Rule 9(b), and other courts in this District considering almost identical allegations agree. *See Spears*, 2026 U.S. Dist. LEXIS 202846, at *43-44 (denying defendant's motion to dismiss in full and citing *Haleon*, 815 F. Supp. 3d at 873). Here, the Court should not dismiss Plaintiffs' claims because Plaintiffs provided "detailed information [] sufficient . . . to place [defendant] on notice of the basis for [plaintiff's] claims and demonstrate[] that [plaintiff is] not on a 'fishing expedition.'" *In re Clorox Consumer Litig.*, 894 F.Supp.2d 1224, 1234 (N.D. Cal. 2012).

**2. Plaintiffs Sufficiently Alleged Damages.**

Regarding damages, Plaintiffs are not limited to out-of-pocket expenses, but may seek compensatory damages for any type of harm, as well as punitive damages. *See In re: Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1135 (N.D. Cal. 2018) (holding "the appropriate measure of damages is defined by Civil Code sections 1709 and 3333," which provide

broad relief for any harm). Here, Plaintiffs allege the loss of "money and/or property," the "diminution of the value of their private and personally identifiable information," and the loss of their "property right to control the dissemination and use of their personal information." CAC ¶¶ 260–61. They plead facts quantifying that value: advertising prices fall 18–23% when users cannot be uniquely identified, and behaviorally targeted advertisements are worth more than twice as much as untargeted ones. *Id.* ¶ 142. Courts, including this one, have accepted comparable privacy-harm and diminished-data-value theories as sufficient fraud damages at the pleading stage. *See, e.g.*, *Barrales*, 2026 U.S. Dist. LEXIS 171400, at *33 (finding plaintiffs adequately alleged damage based on harm to their privacy rights); *Politico*, 2026 U.S. Dist. LEXIS 25740, at *20 ("Plaintiff[s'] affected personal information 'ha[s] value as demonstrated by the use and sale of consumers' browsing activity,' and Defendants 'gained financially from' their misrepresentation even as the misrepresentation revoked Plaintiff[s'] control over that information and diminished its value.") (citing *Rest. Brands Int'l, Inc*., 2025 U.S. Dist. LEXIS 230964, at *22); *In re Facebook*, 956 F.3d at 599–600 (a plaintiff can be harmed by loss of control over personal information).

Defendant's damages argument, that Plaintiffs must plead "actual monetary loss" and cannot satisfy that requirement with abstract privacy and data-value theories, holds no water. MTD at 19–20. Plaintiffs need not show damages with greater specificity to prevail at the pleadings stage on fraud claims. *See Rodriguez v. Google LLC*, 2024 U.S. Dist. LEXIS 1290, at *35 (N.D. Cal. Jan. 3, 2024) (granting *class certification* when damages were based on "[u]ser's willingness to pay to prevent [their] data collection and [the] organizations' willingness to pay for data collection.") (emphasis added). In the decisions Defendant cites: (1) defendants did not present plaintiffs with the false choice to opt out of data sharing; and (2) plaintiffs alleged generally that their data could be monetized with no supporting detail. MTD at 20 (citing *Magliocca v. United Healthcare Servs*., 2026 WL 878694, at *2, n. 1 (E.D. Cal. Mar. 31, 2026) (plaintiff made a "single reference in the complaint to an alleged 'loss of money'"); *Hernandez-Silva v. Instructure, Inc.*, 2025 WL 2233210, at *4-5 (C.D. Cal. Aug. 4, 2025) (alleging generally that defendant used information to "control or monetize children and their personal

information.”). Here, Plaintiffs plead both that they used the Website in reliance on Defendant’s false privacy promises and specific figures for the value of their data for Defendants and Third Parties if behavioral targeting, like that Plaintiffs opted out of, is enabled. CAC ¶¶ 142, 150, 152, 164, 166, 178, 180, 188, 190. Courts have sustained privacy-harm fraud damages based on similar allegations about the value of data to defendant and third parties using it for advertising. *In re Facebook*, 956 F.3d at 599–600. The Court should do the same here.

**F. <u>Plaintiffs State a Claim for Unjust Enrichment.</u>**

To successfully plead unjust enrichment, “a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff’s expense.” *Katz-Lacabe*, 668 F. Supp. 3d at 945. Here, Plaintiffs allege that Defendant benefited from unlawfully taking and using their Private Communications. *See In re Facebook*, 956 F.3d at 600 (“Plaintiffs have adequately pleaded an entitlement to Facebook’s profits from users’ personal data” where they “allege that their browsing histories carry financial value”). Contrary to Defendant’s contention, Plaintiffs adequately allege Defendant was enriched and unjustly retained something of value and “[t]hese allegations are all that is necessary at this stage in the proceedings.” *Shah v. Capital One Fin. Corp.*, 768 F. Supp. 3d 1033, 1051 (N.D. Cal. 2025) (refusing to dismiss unjust enrichment claim in a privacy case).

Plaintiffs allege a direct benefit to Defendant because Defendant “uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising,” and “can identify California users who visit webpages related to particular furniture products and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.” CAC ¶ 140. Defendant “monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.” *Id.* ¶ 141. Plaintiffs also allege their data “carr[ies] financial value[.]” *Id.* ¶ 142. This suffices. *See, e.g.*, *Capital One Fin. Corp.*, 768 F. Supp. 3d at 1051; *In re Facebook*, 956 F.3d at 596 (“California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss” so long as the data “carr[ies] financial value.”).

Defendant claims that Plaintiffs' unjust enrichment claim fails because it is not a standalone cause of action and parrots the oft-rejected argument that *Sonner v. Premier Nutrition Corp.* precludes pleading both legal and equitable remedies. MTD at 33 (citing 971 F.3d 834, 844 (9th Cir. 2020)). But there is no prohibition on pleading alternate or independent claims of unjust enrichment and, where Plaintiffs may lack an adequate remedy at law, they "may allege claims in the alternative at the pleading stage." *Freeman v. Indochino Apparel, Inc.*, 443 F. Supp. 3d 1107, 1114 (N.D. Cal. 2020); *see also Junhan Jeong v. Nexo Fin. LLC*, 2022 U.S. Dist. LEXIS 10089, at *92 (N.D. Cal. Jan. 19, 2022) (collecting cases and concluding that "*Sonner* has limited applicability to the pleading stage because it pertained to circumstances in which a plaintiff dropped all damages claims on the eve of trial.").

Defendant's argument that Plaintiffs have not alleged that their data carries economic value or Defendant itself received any benefit are also without merit. *See* MTD at 33-34. Plaintiffs specifically plead that the information Defendant and Third Parties gathered is valuable. *See supra* III.F. Moreover, the cases upon which Defendant relies are distinguishable. MTD at 33-34 citing *Foris Dax*, 2026 U.S. Dist. LEXIS 113330, at *25 (the complaint indicated "at most, that third-parties benefited"); *Hernandez-Silva*, 2025 WL 2233210 at *4-5 (alleging generally that defendant used information to "control or monetize children and their personal information"); *LinkedIn Corp.*, 900 F. Supp. 2d 1010 (distinguished by *In re Facebook*, 956 F.3d at 606 because there were "no allegations that the defendants tracked the plaintiffs after the plaintiffs stopped using the defendant's services"); *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593, 1596 (2008) (did not involve internet data privacy)).

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss in its entirety. Should the Court conclude that any claim requires additional detail, Plaintiffs request leave to amend as this is Plaintiffs' first consolidated pleading, and Defendant has identified no defect that could not be cured. *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).

Dated: September 17, 2026

**GUTRIDE SAFIER LLP**

*/s/ Hayley Reynolds*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Hayley A. Reynolds (State Bar No. 306427)
hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

**KOTHARI LAW**

*/s/ Vivek Kothari*
Vivek Kothari (Cal. Bar No. 262842)
vivek@kothari.law
555 SE Martin Luther King Blvd.
Portland, OR 97214
Telephone: 503-567-6735

*Attorneys for Plaintiffs*